# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3517

_____

United States of America

*Plaintiff - Appellee*

v.

Veronica J. Fairchild

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 23, 2015
Filed: March 17, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found Veronica J. Fairchild guilty on four counts of making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1). The district court[1] sentenced Fairchild to 33 months' imprisonment. On appeal, Fairchild argues that (1)

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

insufficient evidence supports the jury's finding that Fairchild knowingly and willfully underreported her income; (2) the district court abused its discretion in failing to instruct the jury that it was required to unanimously agree on which source of income that Fairchild failed to report on her income tax return; and (3) the district court improperly calculated Fairchild's Guidelines range and imposed a substantively unreasonable sentence. We affirm.

## I. *Background*

"We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts." *United States v. Ramon-Rodriguez*, 492 F.3d 930, 934 (8th Cir. 2007) (citation omitted).

In 2009, Internal Revenue Service (IRS) Special Agent Daniel Wright opened an investigation on Fairchild and her husband. Agent Wright discovered that Fairchild and her husband had not filed income tax returns since 2004. Agent Wright obtained records from Fairchild's two primary bank accounts dating back to January 1, 2005. These bank records showed that a number of large cashier's checks had been deposited into her accounts. Specifically, there were 37 deposits of checks from David Karlen totaling $1,103,647.84. Fairchild's accounts reflected another six checks totaling $50,000 from Paul Pietz deposited into two main accounts in 2008. The bank records also showed $210,348.39 in total cash deposits from 2005 to 2008.

In July 2010, Fairchild and her husband filed joint income tax returns for 2005, 2006, 2007, and 2008, apparently unaware of the ongoing IRS investigation. Fairchild, a professional adult entertainer, reported income in each of the respective years as $122,345; $120,000; $120,000; and $151,325. The total income reported of $513,670 was far less than the $1,153,647.84 that Fairchild received from Karlen and Pietz during that same time span. Additionally, the returns did not identify any of Fairchild's cash deposits during those years as income.

Agent Wright interviewed Fairchild about her tax returns on July 13, 2011. During that interview, Fairchild explained "that she actually thought all of the money, that every single cashier's check she received from Mr. Karlen was a gift, but that she had reported some of it to take some of the tax burden off of him." To determine how much income to claim, Fairchild told Agent Wright that she "ballparked" the amount. In the same interview, Fairchild also claimed that the money from Pietz was a gift and that he had told her that he reported the gift on his income tax return. Even though $30,000 of the money from Pietz was included as income on her 2008 income tax return, Fairchild maintained that it was really a gift that her accountant had mistakenly included as income.

At trial, Fairchild explained that in addition to the money that she earned dancing on stage, she also made money off stage in private rooms at the exotic dancing clubs or off the premises. Fairchild testified that she gave private dances to both Karlen and Pietz and maintained that these private dances never included sex.

Fairchild also testified that Karlen "knew everything about me financially." According to Fairchild, she asked Karlen for money for constructing her home, paying bills, getting breast implants, and paying college tuition, and Karlen would provide the funds. She considered it all a gift. Fairchild testified that she thanked Karlen for the money that he "gifted" her by giving him free private dances.

Fairchild admitted that she did not file income tax returns for 2005 through 2008 until 2010, but she claimed that the delay was due to problems that she experienced during the construction of her new home. She claimed that when she met with her accountant in 2010 to prepare her tax returns, she decided to claim some of the gifts from Karlen as income to benefit him, so that he did not have to pay the taxes on all of it. To determine her income over the four years, she "decided that any time [she] spent with David [Karlen], anything that could be construed as income or considered a gray area at a thousand dollars an hour." She testified that she spent an

average of two times per month with Karlen over the 48-month period, and she estimated that she spent approximately four or five hours with Karlen during each "session." She stated that she also included going out to eat with Karlen as part of the billable time. Fairchild calculated that she had earned "about $120,000 a year" for each of the four years for services that she provided to Karlen. She testified that, at the time that she filed the tax returns, she believed that the money in excess of what she reported as income was "[g]ifts." But Fairchild admitted that "Karlen never used the word 'gift' with [her]."

According to Karlen, he met Fairchild in 2003 or 2004 while she was dancing. He tipped her money when she danced on stage and paid for private dances inside the club in a private room. Fairchild gave her phone number to Karlen and would call him to tell him when and where she would be dancing. In 2005, Karlen went to watch Fairchild dance at a club; while there, Fairchild asked Karlen if he was interested in paying for sex with her outside of the club. Karlen testified concerning the first time that he met with Fairchild for a "private meeting outside the club." He stated that it occurred in Sioux Falls and that "it was just oral sex for . . . a thousand dollars." When asked if they had "more meetings after that," Karlen answered that they "probably did two, three, four of those." Karlen then confirmed that he later met Fairchild at a hotel for intercourse and paid her $5,000 in "[c]ash." He testified that Fairchild charged him the same price for future similar encounters.

Prior to April 2005, Karlen paid Fairchild in cash. But around this time he began writing checks to Fairchild. Karlen explained that Fairchild would always ask him for a certain amount. For example, Karlen wrote a check in the amount of $39,000 on April 11, 2005, to Fairchild for sex. After Karlen started paying with checks, that is how he continued to pay Fairchild. Between 2005 and 2008, Karlen paid Fairchild $1,103,647.84 with 37 checks. When asked how he "treat[ed] the money that [he] gave to [Fairchild]," Karlen replied, "[f]or her service. . . . For sex." When asked whether the 37 payments were all for sexual services, Karlen replied, "[e]very one of

those." He later confirmed that "[t]he whole $1.1 million was for sex" and that "[e]verything was for sex."

According to Pietz, he first paid Fairchild $5,000 for a private dance at his home in February 2008. Pietz testified that Fairchild sometimes charged him $10,000 for a private show. In total, Pietz made six payments to Fairchild totaling $50,000. Pietz confirmed that he never paid Fairchild "money for anything other than a private dance."

Fairchild retained Certified Public Accountant Derry Anderson in 2005 because Fairchild and her husband were opening a clothing store business and wanted advice on the type of corporation to create. Additionally, they hired Anderson to provide payroll services and to prepare their 2005 income tax returns. In May 2006, after filing requests with the IRS to file the income tax returns late, Anderson met with Fairchild to determine her income. Because Fairchild had no other documentation of her income, she reviewed her bank statements with Anderson to determine which deposits were income. Anderson testified, "I went through and had Veronica [Fairchild] read off the deposits to me, and I ran a tape on my calculator of the number of deposits that she would tell me. That's what we used as the total income for the 2005 Schedule C." Through that process, they calculated Fairchild's gross income from cash received in 2005 to be $308,727.69. After receiving additional information related to deductions from Fairchild in late October 2006, Anderson completed the 2005 tax return in December 2006. Anderson met with Fairchild and her husband on December 15, 2006, to review the completed return. Based on the information that Fairchild reported to Anderson, he determined that her gross income as a professional adult entertainer for 2005 was $311,073. As a result, Fairchild and her husband owed $56,217 in taxes, before penalties and interest.

Anderson had also prepared the income tax return for Fairchild's clothing business and provided it to her. That return indicated a business loss with no tax

liability. Anderson testified that he reviewed the tax returns with Fairchild and her husband and that "there was [sic] no issues on the gross income." He advised them to mail the returns to the IRS. Although Fairchild and her husband did mail the tax return for the business, they did not mail their personal income tax return. Instead, once Fairchild and her husband departed Anderson's office that day knowing that they owed $56,217 in taxes, they went to the Sioux Falls Federal Credit Union and borrowed over $100,000 to buy two Cadillac Escalades and a boat.

Before Fairchild and her husband left Anderson's office, they told him that Fairchild's income was expected to be higher in 2006. Based on information that Fairchild provided, Anderson began to prepare the income tax return for 2006. As he did for the 2005 return, Anderson reviewed deposits in Fairchild's bank accounts in 2006 and determined that her gross income was $517,081. Anderson prepared a "working draft for the 2006 return," and he provided Fairchild and her husband with a copy of it.

But Anderson did not prepare a 2006 income tax return for Fairchild until 2010. Fairchild and her husband met with Anderson in March 2010 to complete the income tax returns for 2006, 2007, and 2008. According to Fairchild, Anderson and her husband needed to complete their tax returns to obtain financing for a real estate purchase in Lake Okoboji, Iowa. Prior to that time, Fairchild had not provided Anderson with enough information to complete the returns. At the March 2010 meeting, Fairchild disclosed to Anderson that she had not filed the 2005 income tax return that Anderson had previously prepared.

Also during the March meeting, Fairchild told Anderson for "the first time" that "she actually received a gift" from Karlen. Thus, the filed 2005 tax return accounted for this "change in income" and resulted in Fairchild actually requesting a refund of $1,979. Anderson admitted that Fairchild going from owing $56,217 on the 2005 return prepared in 2006 to requesting a refund on the filed 2005 return was "quite a

change." Likewise, the taxes owed on the 2006 "working draft" went from $117,114 to $4,922.

Between 2006 and 2008, Fairchild completed and signed several loan applications with financial institutions. In January 2006, she signed and submitted an application to Keystone Mortgage declaring her income to be $24,800 per month. In December 2006, when she borrowed money from the Sioux Falls Bell Federal Credit Union to purchase the boat and vehicles, she stated that her income was $17,647 per month. In March 2007, on a loan application for a Mercedes Benz, she stated that her annual income was $274,881. To support the loan application, Fairchild's husband directed Anderson to send a copy of the *unfiled* 2005 income tax return that had been prepared in December 2006.

Fairchild also relied on the 2006 "working draft" income tax return to support her income level when she applied for a loan with Sioux Falls Federal Credit Union in 2007. At Fairchild's request, Anderson provided a copy of the 2006 "working draft" to Sioux Falls Federal Credit Union to verify her income to obtain a loan. In June 2007, when completing a mortgage application with Wells Fargo Bank, she claimed that her monthly income was $37,612. In July 2007, when applying for a loan to purchase a new Corvette, Fairchild stated that her gross annual income was $383,319. The same annual income was reported in 2008 when Fairchild applied for a $30,000 loan to purchase a completely restored 1970 Pontiac GTO.

In September 2008, Fairchild asked Anderson to fax information about her 2007 income for a loan application with the Air Guard Federal Credit Union. Anderson sent a fax that stated, "[t]he Schedule C gross income will be close to the 2006 gross income, around $300,000 based on the information provided by Veronica [Fairchild]."

Fairchild was charged with four counts of making and subscribing a false income tax return for tax years 2005 through 2008, in violation of 26 U.S.C.

§ 7206(1). A jury trial commenced. After the close of the government's case, Fairchild moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motion.The jury convicted Fairchild on all four counts. The district court sentenced Fairchild to 33 months' imprisonment on each count to run concurrently.

## II. *Discussion*

On appeal, Fairchild argues that (1) insufficient evidence exists to support the jury's finding that Fairchild knowingly and willfully underreported her income; (2) the district court abused its discretion in failing to instruct the jury that it was required to unanimously agree on which source of income that Fairchild failed to report on her income tax return; and (3) the district court improperly calculated Fairchild's Guidelines range and imposed a substantively unreasonable sentence.

## A. *Sufficiency of the Evidence*

Fairchild argues that the evidence is insufficient to sustain her convictions for making and subscribing a false income tax return for tax years 2005 through 2008, in violation of 26 U.S.C. § 7206(1), because no reasonable jury could conclude that she falsely reported her income or tax liability. She further asserts that even if her declaration of income and tax liability were "false," no reasonable jury could find that she believed that she was understating her income or that she willfully and intentionally did so.

"Our standard of review on this issue is quite narrow." *United States v. Smith*, 104 F.3d 145, 147 (8th Cir. 1997) (citation omitted). When reviewing a district court's denial of a motion of judgment of acquittal based on sufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict. *Id*. The government gets "the benefit of all the reasonable inferences that could logically be drawn from the evidence." *Id*. (citation omitted). "We must uphold the verdict if the evidence so viewed is such that there is an interpretation of the evidence that would allow a

reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." *Id.* (quotation and citation omitted).

Fairchild was convicted of violating 26 U.S.C. § 7206(1), which prohibits "[w]illfully mak[ing] and subscrib[ing] any return . . . , which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." To prove a violation of § 7206(1), the government must put forth evidence "that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law." *Kawashima v. Holder*, 132 S. Ct. 1166, 1172 (2012) (citations omitted). "In general, a false statement [under § 7206(1)] is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (second alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).

### 1. *Falsity*

Fairchild argues that the evidence was insufficient to show that her declaration of her income and tax liability for 2005, 2006, 2007, and 2008 was "false."

According to Fairchild, the amounts that she declared were consistent not only with her estimation of the overall cost for services that she provided to Karlen and Pietz but also with Karlen's and Pietz's estimations. Fairchild estimated spending about five hours with Karlen twice a month from 2005 to 2008, which totals 120 hours per year. A charge of $1,000 per hour for the 120 hours totals $120,000. Fairchild contends that she declared this amount as income on her tax return for each year and notes that she was not required to declare or pay tax on money received as a gift. Fairchild maintains that Karlen's estimation was actually $60,000 *lower* than the amount that she actually declared of $480,000. She cites Karlen's testimony that he

paid her for sex a couple of times a month for a three-and-a-half-year period at a rate of $5,000 for each time that they had sex. At trial, Karlen agreed that multiplying $10,000 (for the two sexual encounters per month) by 42 months yielded $420,000 for the entire period. Fairchild points out that she declared a total of $480,000 for the four years in question, which is $60,000 more than the $420,000 estimation.

Fairchild acknowledges Karlen's claim that the entire $1.1 million that he gave to Fairchild over this period was payment for sex but nonetheless argues that a "step-by-step calculation of the number of times Karlen said he and Fairchild got together multiplied by $5,000, the rate Karlen maintained at trial, yields a grand total much lower than the $1.1 million he gave Fairchild."

Fairchild also argues that her declaration of income attributable to Pietz was consistent with Pietz's estimation of how much he paid for private parties. She estimated that $25,000 to $30,000 of the money that she received from Pietz constituted income and declared the higher amount as income on her 2008 return, while he testified to paying $5,000 or $10,000 per private party and to giving a total of $50,000 in checks to Fairchild, not all of which were for private dances. Fairchild concludes that her declaration of $30,000 in income attributable to Pietz was consistent with the amount that Pietz said that he paid for private parties.

We hold that sufficient evidence exists to support the jury's finding that Fairchild made "false" declarations on her tax returns. *See Kawashima*, 132 S. Ct. at 1172. First, as Fairchild concedes, Karlen *did* testify that the *entire* $1.1 million that he gave to Fairchild was for the payment of sex. Karlen's testimony conflicting with that representation does not mean that the jury could not have credited his representation that the entire $1.1 million that he gave to Fairchild was for payment of sex. "When reviewing a verdict, we do not question credibility determinations made by the jury. A jury is free to believe or reject a witness's testimony in part or in whole." *United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008) (citations omitted);

-10-

*see also Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) ("The jury may use common sense in evaluating witness testimony and may disregard all or part of any witness's testimony . . . ."). "The jury is free also to accept one or more witnesses'[] testimony only in part and thereby to create its own version of the facts." *United States v. Felix*, 996 F.2d 203, 207 (8th Cir. 1993) (citation omitted).

Second, the jury could infer from the evidence that Fairchild declared *all* of the money that she received from Karlen and Pietz on the loan documents that she submitted to obtain loans from financial institutions. As explained *supra*, between 2006 through 2008, Fairchild completed and signed several loan applications with financial institutions in which she had to declare her income. These nine loan applications to four financial institutions declared that Fairchild's annual income ranged from $211,764 to $451,344. In support of some of the loan applications, Fairchild and her husband had Anderson send to lenders a copy of the 2005 income tax return that had been prepared but not filed. They also had Anderson send lenders a copy of the 2006 "working draft" income tax return, as well as a fax stating that "[t]he Schedule C gross income will be close to the 2006 gross income, around $300,000 based on the information provided by Veronica [Fairchild]."

Third, the jury could conclude that the information that Fairchild gave to Anderson, her accountant, demonstrated the falsity of her tax returns. The evidence shows that Fairchild initially treated all of the money that she received from Karlen as income. In 2006, Fairchild told Anderson that her income for 2005 was $311,073 and that her income was going to increase. As a result, Anderson determined Fairchild's income for 2006 to be $517,081 and provided a working draft, which Fairchild later used to apply for a loan. It was not until March 2010 when Fairchild and her husband met with Anderson that Fairchild *first* stated that not all of the money that she had received from Karlen or Pietz was income. Fairchild presented a new explanation that her income was $120,000 per year and anything that she received

beyond that was a gift. But, at trial, both Karlen and Pietz testified that any money that they paid her was for services.

## 2. *Belief and Willfulness*

Fairchild argues that even if her statement of income was inaccurate, the evidence was insufficient to show that she knew and believed that she had underreported her income. According to Fairchild, the nature of the money that she received from Karlen and Pietz was "unclear." She notes that she, Karlen, and Pietz all gave different accounts of the nature of the money over time and that her accountant did not know how to categorize the money for tax purposes. She asserts that she "liberally" estimated the money received from Karlen and Pietz as payment for private parties. She cites her testimony at trial that she "truly believed that she accurately declared income from these private clients and that the remainder of the money was gifted to her." She concludes that because of the "widespread confusion over the nature of the money, no rational juror could have found that [she] believed that the declaration of her income was false." Fairchild also argues that the evidence was insufficient to show that she willfully made and subscribed false tax returns. She asserts that she sincerely held this belief and that she did not willfully violate the tax laws because she had a good-faith belief that the money that she received from Karlen and Pietz above and beyond the amount that she declared as income was a gift.

"Filing false tax returns is a specific intent crime requiring a showing of willfulness, which 'simply means a voluntary, intentional violation of a known legal duty.'" *United States v. Mathews*, 761 F.3d 891, 893 (8th Cir. 2014) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)). "Intent may be inferred from conduct, and [w]illfulness in a criminal tax case may be established by a consistent pattern of not reporting income or inconsistently reporting income." *Id.* at 893 (alteration in original) (quotations and citations omitted). Furthermore, the factfinder may infer from the facts of the case whether an act was committed willfully. *Id.* at 894.

Fairchild contends that the government failed to prove that her conduct was willful because there was evidence of her good-faith belief that she was not violating the tax laws. "'The issue is whether, based on all the evidence, the [g]overnment has proved that [Fairchild] was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable.'" *United States v. Morse*, 613 F.3d 787, 794 (8th Cir. 2010) (first alteration in original) (quoting *Cheek*, 498 U.S. at 202). The government frequently must prove intent "by circumstantial evidence; the determination often depends on the credibility of witnesses, as assessed by the factfinder." *United States v. Morris*, 723 F.3d 934, 939 (8th Cir. 2013) (quotation and citation omitted). "The jury may infer intent from the Appellants' conduct, such as inconsistencies between Appellants' representations to government agencies and other entities." *Id.* (citation omitted). Because "knowledge . . . turns in large part on the credibility of the witnesses," it "is peculiarly within the province of the factfinder." *Id.* (quotation and citation omitted). For that reason, a jury is "free to disregard [a defendant's] statements as not credible" in evaluating whether the defendant had a "'good[-]faith belief' that he was properly preparing his tax returns." *Mathews*, 761 F.3d at 894.

We hold that sufficient evidence exists to support the jury's finding that Fairchild knew and believed that she had underreported her income *and* that she willfully did so. At trial, Fairchild testified that she truly believed that she accurately declared income from Karlen and Pietz and that the remainder of the money was a gift to her. But, "the jury was free to disregard [Fairchild's] statements as not credible." *See Mathews*, 761 F.3d at 894.

B. *Jury Instructions*

The indictment alleged that Fairchild willfully made and subscribed a false Form 1040 for each year in question, which "understated the amount of total income she received as a professional adult entertainer, as well as the tax liability owed." The

-13-

district court proposed a jury instruction on making and subscribing a false tax return, which read, in relevant part, with regard to the first element:

> For you to find Fairchild guilty of the offenses charged in Counts 1-4 in the Indictment, the prosecution must prove beyond a reasonable doubt *all* of the following five essential elements:
>
> > *One*, that Fairchild made and signed an individual income tax return for the year in question that was false as to income or tax liability owed;
> >
> > > The taxpayer is the one who "makes" a return even if she hired an accountant to prepare the return.
> > >
> > > For the return to be false as to income, Fairchild must have received taxable income that year in addition to the taxable income reported on her return, regardless of the amount. Whether the government has or has not suffered a monetary loss as a result of the alleged return is not an element of this offense.
> > >
> > > For the return to be false as to tax liability owed, Fairchild must have reported less tax liability owed than that which was actually owed.
> > >
> > > *The Indictment charges that both the income and tax liability owed were false as stated by Fairchild in the tax returns in question. It is not necessary for the government to prove both. It would be sufficient if the government proves beyond a reasonable doubt that Fairchild made and signed an individual income tax return that was false as to either the income or the tax liability owed. To find the government has met its burden on this element, however, you must unanimously agree on whether the false matter was regarding Fairchild's income, tax liability owed, or both. If you are unable to unanimously agree, you cannot find Fairchild guilty.*

(Third emphasis added.) (Bold omitted.)

Fairchild's counsel objected to the italicized paragraph and proposed the following instruction in its place:

> The indictment charges that Fairchild understated both the income she earned and the tax she owed on it. You are instructed that, if she understated her income for any of the four years in question, she also understated her tax liability for that year; conversely, if she did not understate her income for any of the four years in question, she also did not understate her tax liability for that year.
>
> Your verdict must be unanimous as to all four counts of the indictment. In Count 4, there was evidence about income Fairchild received from two men, David Karlen and Paul Pietz. To find the government has met its burden on this element in Count 4, you must unanimously agree on whether Fairchild understated her taxable income from David Karlen, her taxable income from Paul Pietz, or both. If you are unable to unanimously agree, you cannot find Fairchild guilty on Count 4.

Counsel's "problem" with the court's instruction was that "[t]he Government hasn't put on any evidence of anything wrong about the returns, except for income. So if the jury finds she lied about the income, that's ipso facto a lie about the tax liability." According to counsel, if the jury had "reasonable doubt about whether she lied about the income, then there's no other evidence about anything else other than the income, and they can't find her guilty of a liability." Counsel argued that "a general unanimity instruction would suffice for that issue" and proposed saying that "if you find she lied about the income, you have to find she lied about the tax liability, and if you don't find she lied about the income, then you can't find that she lied about the liability, because that's the only issue at play." Counsel's concern was that the jury could convict Fairchild "without all 12 of them agreeing on what the actus reus is in this case, what wrong thing she did is in Count 4" because Count 4 involved "evidence

-15-

about false reporting David Karlen and false reporting Paul Pietz." According to counsel, a "real chance" existed that six jury members could believe that Fairchild lied about Karlen but not Pietz, while the other six members could believe that Fairchild lied about Pietz but not Karlen. Counsel asserted that the jury "would recognize that that means acquittal on Counts 1 through 3 where Karlen is the only issue." But he contended that unless the jurors were "specifically instructed about their duty to unanimously agree to a particular set of facts [on Count 4], they could . . . say, well, on Count 4 six of us agree she lied about Karlen. Six of us agree she lied about Pietz. Six plus six is 12, guilty."

The government objected to Fairchild's proposed instruction, arguing that (1) elements instructions do not typically discuss the facts of the case, and (2) the instruction "unnecessarily and wrongfully tries to box [the jurors] in as to how they come to their determination of the underreporting of income, which is the falsity."

The court commented that the issue in the case was whether Fairchild "reported all of her income, in general," *not* whether "a particular false statement was made regarding that reported income." The court then rejected Fairchild's proposed instruction, stating:

> Well, I think the only reason the unanimity instruction is needed is because the Indictment charges two different ways of making a false statement, either by underreporting her income or by underreporting her tax liability. That's why the unanimity instruction is included.
>
> I guess I just do not agree with the fact that it's needed. I think it's, first of all, improper for the Court to comment on the evidence that's come in, that there may be different ways of proving that the reported income is underreported.

-16-

But I'm going to leave it based on the language of the Indictment, which is that she underreported her income or underreported her tax liability.

I will include your Proposed Final Instruction. I'm going to mark it "refused," because I don't think it's necessary, and it may confuse the jury.

I think the instruction, as the Court has it, accurately tells the jury how they need to sort out this issue. So that objection is overruled.

On appeal, Fairchild argues that because the government presented evidence of multiple sources of allegedly unreported income, the indictment was duplicitous, and the district court's jury instructions failed to ensure that the jury reached a unanimous verdict for each count. Fairchild concedes that her "duplicity argument does not rest on the language of the indictment." But she asserts that "this is not damning to [her] argument" because "the potential for a nonunanimous verdict arose out of the evidence of multiple sources of unreported income for each tax year," meaning that "the jury should have been instructed to agree on the willful falsity of 'one factually distinct false statement.'" (Quoting *United States v. Duncan*, 850 F.2d 1104, 1113 (6th Cir. 1988), *overruled on other grounds by Schad v. Arizona*, 501 U.S. 624 (1991).) She asserts that her proposed jury instruction "would have cured [the indictment's] duplicity" and ensured jury unanimity.

"We review jury instructions for abuse of discretion, and '[i]n so doing, we do not consider portions of a jury instruction in isolation, but rather consider the instructions as a whole to determine if they fairly and adequately reflect the law applicable to the case.'" *United States v. Pierce*, 479 F.3d 546, 549 (8th Cir. 2007) (alteration in original) (quoting *United States v. Turner*, 189 F.3d 712, 721 (8th Cir. 1999)).

-17-

As Fairchild admits in her brief, she is not attacking the language of the indictment; that is, she does not argue that "the indictment is . . . duplicitous on its face. Instead, [she argues that] the indictment was rendered duplicitous by the evidence presented at trial." *United States v. Pietrantonio*, 637 F.3d 865, 871 (8th Cir. 2011) (citing *United States v. D'Amico*, 496 F.3d 95, 100 (1st Cir. 2007) ("[T]he fact that an indictment is not duplicitous on its face of course does not guarantee that a jury verdict will be unanimous, based on the evidence actually presented.")). Fairchild maintains that the government created a duplicitous indictment by presenting three sources of "underreported" income at trial: (1) unreported checks from Karlen and unreported tips for dancing in clubs in 2005; (2) unreported checks from Karlen and unreported income for dancing in clubs in 2006 and 2007; and (3) unreported checks from Karlen, unreported checks from Pietz, and unreported tips for dancing in clubs in 2008. Fairchild asserts that to reach a unanimous verdict, the jury needed to agree on which income that Fairchild failed to report for each tax year.

The present case is analogous to *United States v. Adler*, 623 F.2d 1287 (8th Cir. 1980). In that case, the defendant was charged with Medicare fraud for submitting false invoices to Medicare for reimbursement. *Id*. at 1288. Each count of the indictment concerned a different invoice (comparable to each count of Fairchild's indictment concerning a different tax year). *Id*. at 1289. Additionally, each invoice had multiple fraudulent line items on it (comparable to evidence of multiple sources of Fairchild's unreported income for each year). *Id*. at 1290. The defendant challenged the indictment as duplicitous because some of the counts involved invoices with more than one fraudulent line item on them. *Id*. We rejected the defendant's argument, explaining that "the government charged only one crime in each count of the indictment. There may be more than one piece of evidence to support each count, but that certainly does not make the counts duplicitous." *Id*. (citations omitted). "In other words, each invoice was a single execution, and the line items on each invoice were merely additional means of pursuing the single execution." *United States v. Palazzo*, 372 F. App'x 445, 452 (5th Cir. 2010) (per curiam) (citing *Adler*, 623 F.2d at 1290).

-18-

Similar to *Adler*, each one of Fairchild's tax returns was "a single execution," and the multiple sources of unreported income contained in each tax return constituted "multiple *means* of accomplishing" Fairchild's making of a false statement as to her income and tax liability for a particular tax year. *See id*.

As the government points out, requiring the jury to decide unanimously whether the unreported income came from Karlen, Pietz, or another source was unnecessary because it was not an essential element of the crime; each source provided alternative pieces of evidence to support each count of the indictment.

Fairchild relies primarily on *Duncan* in arguing that because each juror could have found a different source of unreported income for each of her tax returns, there was a significant risk of a nonunanimous verdict on each count. *See Duncan,* 850 F.2d at 1111 (concluding that an indictment alleging separate false statements for one count of violating 26 U.S.C. § 7206 was duplicitous after finding that the "essence of the statute lies in the willful falsity of a statement"). *Duncan*, however, provides no support. *Duncan* involved an extremely complex count with what that court considered "a tangible risk of jury confusion." *Id*. at 1114. The instant case was neither extremely complex nor posed a tangible risk of confusion for the jury. The district court adequately distinguished *Duncan*, explaining that

> the difference between this case and *Duncan*, if it still is good law in the Sixth Circuit, is that the statute here and what's charged in the Indictment is that the Defendant failed to report income and underreported her tax liability.
>
> So the issue that the jury is looking at is whether she reported all of her income, in general. *It's not that a particular false statement was made regarding that reported income. That's not what's charged in the Indictment.*

\*\*\*

-19-

I think the only reason the unanimity instruction is needed is because the Indictment charges two different ways of making a false statement, either by underreporting her income or by underreporting her tax liability. That's why the unanimity instruction is included.

I guess I just do not agree with the fact that it's needed. I think it's, first of all, improper for the Court to comment on the evidence that's come in, that *there may be different ways of proving that the reported income is underreported*.

(Emphases added.)

Even assuming duplicity in the indictment, the district court's instruction cured any potential prejudice created thereby. "Courts have held that the risk of a nonunanimous verdict inherent in a duplicitous count may be cured when the jury is given a limiting instruction that requires it to unanimously find the defendant guilty with respect to at least one distinct act." *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir. 1994) (citations omitted). In the present case, the district court gave such a limiting instruction by requiring the jury to "unanimously agree on whether the false matter was regarding Fairchild's income, tax liability owed, or both."

Accordingly, we hold that the district court did not abuse its discretion in instructing the jury.

## C. *Sentence*

Fairchild argues that her 33-month sentence is procedurally and substantively unreasonable. First, she asserts that the district court's calculation of the Guidelines range was based on an erroneous calculation of the tax-loss amount and an erroneous finding that Fairchild failed to report income from criminal activity. Second, she maintains that her 33-month sentence is substantively unreasonable for failing to account for the effects of past sexual abuse and her status as the sole parent to three young children.

"We review the district court's sentencing, whether inside or outside the guidelines range, for an abuse of discretion." *United States v. Straw*, 616 F.3d 737, 743 (8th Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Our first task is to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Gall*, 552 U.S. at 51. "If no procedural error has been committed, we review the sentence for substantive reasonableness under an abuse of discretion standard." *Straw*, 616 F.3d at 743 (citing *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)). Fairchild bears the burden "to show that h[er] sentence should have been lower considering the factors enumerated in 18 U.S.C. § 3553(a)." *See id.* (citing *United States v. Milk*, 447 F.3d 593, 603 (8th Cir. 2006)).

### 1. *Procedural Error*

The presentence investigation report (PSR) calculated Fairchild's base offense level to be 18 pursuant to U.S.S.G. §§ 2T1.1 (2014) and 2T4.1(G) (2014) based on a tax-loss amount of $214,606. It assessed a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(1) (2014) for "fail[ing] to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity" because Fairchild had "engaged in sexual activity for a fee, which is a violation of state and federal law." Based on a total offense level of 20 and a criminal history category of I, the PSR calculated a Guidelines range of 33 to 41 months' imprisonment. Fairchild objected to the tax-loss determination and to the two-level enhancement for failure to report income from criminal activity.

### a. *Tax Loss*

The district court overruled Fairchild's objection to the PSR's determination that the tax loss exceeded $200,000 and found an actual tax-loss amount of $214,606. The court explained:

In looking at the issue of unreported income, money received from services and tips should both be included.

The Defendant's own testimony during the trial indicated that she received tips during the time period in question in cash. She admitted that was not reported as income on her income tax returns, and she stated that was just an oversight.

With regard to the cash deposits, the money that she put into the Federal Credit Union, she testified the $35,000 in 2005 came either from David Karlen or from dancing. She testified that the $38,000 in 2006 came from David Karlen and a little dancing. She testified that the $55,000 in cash deposited in 2007 came from David Karlen or dancing. She testified that the $80,000 in cash in 2008 came from David Karlen. "Gave her large amounts" was the testimony. She admitted that none of that cash was reported on her Federal income tax return.

That testimony that she gave under oath is consistent with the statement that she made when she was interviewed by Agent Wright.

The amounts in cash for those four years, for many people it's more than they make in one year. There's a lot of people in South Dakota that don't make $35,000, $38,000, $55,000, or $80,000 in a year. So when she testified the source of that money, I think she knew where it came from, because it's a sizable amount.

It's sufficient to meet the Government's burden of proof by a preponderance of evidence that that cash came from either services or tips, and should have been included as income on her Federal income tax return.

"We review de novo whether the district court correctly interpreted and applied the sentencing guidelines, while the court's factual findings are reviewed for clear error." *United States v. Koch*, 625 F.3d 470, 480 (8th Cir. 2010) (citation omitted); *see also United States v. Hart*, 324 F.3d 575, 578 (8th Cir. 2003) ("We review the district court's tax[-]loss calculation for clear error." (citation omitted)).

-22-

In the present case, the PSR calculated Fairchild's base offense level as 18 based on a tax-loss amount of $214,606. According to the probation officer, this figure is "based on the omitted gross receipts of $643,647.84 *plus the total cash gross receipts of $210,348.39*, which came out of trial testimony, which is explained in paragraph 9 [of the PSR]." (Emphasis added.) Paragraph 9 of the PSR provides as follows:

In late July 2010 the Fairchilds jointly filed their income tax returns (Forms 1040) for tax years 2005, 2006, 2007, and 2008. On each return, the defendant reported her earning from her adult entertainment business on a Schedule C. The gross receipts were $122,345; $120,000; $120,000; and $151,325 for tax years 2005 through 2008, respectively. Her total of reported gross receipts was $513,670; however, the tax returns failed to show the omitted amounts deposited into the defendant's bank accounts from Karlen and Pietz totaling $156,447.24 in 2005; $325,000 in 2006; $102,200.50 in 2007; and $60,000 in 2008. *The total omission of income was $643,647.84*, and the tax[-]loss amount was $149,914. Additionally, at trial, while under oath, the defendant stated that large amounts of cash deposited into her account were mostly from Karlen and a small amount of it was from dancing. The IRS agent indicated that because the defendant admitted to these cash amounts as deposits from Karlen and dancing while under oath, it is considered unreported income:

| Year | Reported Gross Receipts | Total Gross Receipts Per Investigation | *Total Cash Gross Receipts Per Trial Testimony* | Omitted Gross Receipts | Unreported Income |
|------|------|------|------|------|------|
| 2005 | $122,345.00 | $278,792.34 | *$35,878.24* | *$156,447.34* | $192,325.58 |
| 2006 | $120,000.00 | $445,000.00 | *$38,258.95* | *$325,000.00* | $363,258.95 |
| 2007 | $120,000.00 | $222,200.50 | *$55,308.00* | *$102,200.50* | $157,508.50 |
| 2008 | $151,325.00 | $211,325.00 | *$80,903.20* | *$60,000.00* | $140,903.20 |
| Totals | $513,670.00 | $1,157,317.80 | *$210,348.39* | *$643,647.84* | $853,996.23 |

-23-

(Emphases added.) (Footnotes and bold omitted.)

Applying § 2T1.1(c)(1)(A) based on these figures, the total tax loss would be $239,118.94 (28 percent of $853,996.23 (total unreported income)). But the PSR calculated a tax-loss amount of $214,606 based on "[t]he additional tax due and owing on unreported income" for 2005 ($59,446); 2006 ($93,870); 2007 ($22,759); and 2008 ($38,531).

At sentencing, the parties agreed that Fairchild's total receipts from Karlen and Pietz was $1,157,317.80; the only factual dispute was whether the amount of cash deposited into Fairchild's bank accounts (total cash gross receipts) during the four-year period should also be included as income. Based on Fairchild's testimony, the district court concluded that all of the cash deposited into her account during the four-year period should be included as income. The court also found that Fairchild's testimony was consistent with the statement that she made to Agent Wright.

We conclude that the district court's factual findings are not clearly erroneous and that the government proved the amount of loss by a preponderance of the evidence based on Fairchild's testimony.

b. *Criminal Activity*

The court overruled Fairchild's objection to the two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(1) (2014). This section provides that "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels." U.S.S.G. § 2T1.1(b)(1) (2014) (bold omitted). Fairchild argues that the district court clearly erred in assessing the enhancement by finding that she engaged in prostitution in violation of South Dakota law. Fairchild contends that she and Pietz testified that Fairchild did not engage in sexual activity in exchange for money. She asserts that Karlen's claim that he paid Fairchild for sex was directly contradicted by Fairchild and Pietz and that Karlen gave

-24-

shifting accounts of the nature of his relationship with Fairchild and the nature of the money that he provided her.

The district court was entitled to credit Karlen's testimony and discredit Fairchild's and Pietz's testimony as to whether Fairchild was paid for sex. *See United States v. Smith*, 681 F.3d 932, 935 (8th Cir. 2012) ("[A] district court's credibility determinations [at sentencing] are virtually unreviewable on appeal." (alterations in original) (quotation and citation omitted)). Karlen repeatedly testified that he paid Fairchild for sex. He testified that all of the money that he paid her was in exchange for sex. We discern no error in the court's application of § 2T1.1(b)(1) (2014).

### 2. *Substantive Reasonableness*

In addition to her objections to the PSR, Fairchild also requested a downward variance based on her personal history and family obligations. The district court denied Fairchild a downward variance and sentenced her to 33 months' imprisonment on each count, to run concurrently. Fairchild argues that her 33-month sentence—a within-Guidelines sentence—is substantively unreasonable for failing to take into account her personal history and family situation and for being greater than necessary under the circumstances.

"It will be the unusual case where we reverse a district court sentence . . . as substantively unreasonable." *United States v. Woodard*, 675 F.3d 1147, 1152 (8th Cir. 2012) (alteration in original) (quotation and citation omitted). "On appeal, we presume a within-Guidelines-range sentence is reasonable." *United States v. Waters*, 799 F.3d 964, 974 (8th Cir. 2015) (citation omitted).

Just as in *Waters*, Fairchild "argues the district court abused its discretion by not giving enough weight to supposed mitigating factors . . . . We disagree. With respect to mitigating factors, the district court considered both written and oral arguments presented by the defendant." *See id*. at 975. The court explicitly stated, "In deciding

your sentence, I look at a variety of things. You had a really hard life as a child. As an adult, you've been a great mom to your kids, and have even taken in a neighbor's child and ended up being the guardian for that child." But the court ultimately gave more weight to other 18 U.S.C. § 3553(a) factors, such as the nature and circumstances of the offense. The court noted that Fairchild has "been a wreck" "on the financial side of things" as evidenced by her continued misrepresentations to banks to obtain loans. Additionally, the court stated that one of its considerations "in deciding a sentence is what responsibility have people taken for their actions to start putting things in order" and found that Fairchild had not yet done so. Specifically, she had failed to file her tax return for the current year, did not file the return the prior year, and had not "paid any Federal income tax over a nine-year time period." The court found this "an indicator of whether [Fairchild has] accepted responsibility and whether [Fairchild is] trying to put things into order and make amends for what's happened, and [the court] d[idn]'t see that." The court noted that Fairchild's crime was a "serious" one and that it had "considered all the factors in 3553(a)(1) through (7), and [it] d[id] not believe there are grounds for a downward variance."

On this record, we hold that the district court did not abuse its discretion in sentencing Fairchild to 33 months' imprisonment.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____