# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-2109

_____

United States of America

*Plaintiff - Appellee*

v.

Kinzey Shaw, also known as Kinzey Basic

*Defendant - Appellant*

_____

No. 19-2165

_____

United States of America

*Plaintiff - Appellee*

v.

Elvis Basic

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted:  June 16, 2020
Filed: July 20, 2020

_____

Before GRUENDER, WOLLMAN, and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Kinzey Shaw and Elvis Basic were found jointly guilty of one count of conspiracy to distribute and possess with intent to distribute a controlled substance and one count of distribution of a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. Shaw and Basic were also found guilty of one count each of distribution of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. Basic appeals his conspiracy conviction and the district court's[1] drug-quantity determination. Shaw appeals the drug-quantity determination and an obstruction-of-justice enhancement applied to her sentence. We affirm.

The evidence presented at trial included testimony that Shaw began selling a fentanyl solution to Tawna Iron Shield in June 2018, while Iron Shield was living in a halfway house in North Dakota. On the first occasion, Shaw parked outside a Walmart and asked Iron Shield if she wanted to try some nasal spray. Iron Shield said yes and sprayed the solution two or three times into her nose, which made her feel "energetic." Iron Shield later bought a bottle of nasal spray from Shaw, agreeing to a price of one hundred dollars. On a separate occasion, Iron Shield obtained another bottle of nasal spray from Shaw at Shaw's mother's apartment for forty dollars. She returned to Shaw's mother's apartment two or three times to refill the nasal spray bottle. Iron Shield told another resident in the halfway house, Jennifer Red Shirt, about her nasal spray bottle and offered to let Red Shirt try it. Red Shirt said that after she did "two squirts" of the solution she felt "high" and "sick."

_____

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

Iron Shield and Red Shirt both failed routine urinalysis tests for drugs later that month and were arrested and jailed. A staff member at the halfway house confiscated Iron Shield's spray bottle and turned it over to law enforcement. An analysis revealed that the spray bottle held 11.69 grams of a liquid solution that contained cyclopropyl fentanyl.[2] Iron Shield was interviewed by a police detective and told him about Shaw's role in supplying the nasal spray.

After learning of Shaw's role in the drug transactions, North Dakota Bureau of Criminal Investigation Special Agent Alex Droske began surveillance of Basic's apartment building because he knew from "previous experience" that Shaw and Basic were associated. During this surveillance, Droske observed a man park next to Basic's vehicle in the apartment building parking lot, look inside Basic's vehicle, then enter the building. The man returned to the lot ten minutes later carrying a round, cylindrical object. Droske followed the man's car as he drove away and saw him shaking a nasal spray bottle in his hand as he drove. Droske initiated a traffic stop after observing the man's erratic driving and learned the man's name was Joseph Otremba. Otremba admitted that he had a nasal spray bottle in his car. This bottle was seized and later revealed to contain a solution that included cyclopropyl fentanyl.

Otremba later testified that he received nasal spray from Basic and Shaw on multiple occasions. When Otremba first used the substance, Basic sprayed it into Otremba's nose. Otremba testified that, at Basic's direction, he paid for a bottle of nasal spray by sending forty dollars to Shaw's PayPal account. He also testified that, during a trip to Fargo with Basic and Shaw, he used the substance multiple times. Shaw would remove the bottle from her purse and use the spray, then pass it to Basic to use, and then to Otremba.

---

[2]The parties do not dispute that cyclopropyl fentanyl is a fentanyl analogue. "A controlled substance analogue is a substance that is 'substantially similar' to a controlled substance in schedule I or II with respect to either its chemical structure or its 'stimulant, depressant, or hallucinogenic effect.'" *United States v. Wolfe*, 781 F. App'x 566, 568 (8th Cir. 2019) (per curiam) (citing 21 U.S.C. § 802(32)(A)).

After Droske stopped Otremba, Droske notified other law enforcement agents of the seizure of the nasal spray bottle.  Ultimately, Shaw and Basic were arrested, and Shaw was placed into the same holding cell as Iron Shield and Red Shirt.  While in that holding cell, Shaw told both Iron Shield and Red Shirt "not to tell on her."

At Shaw's sentencing hearing, the district court calculated a total offense level of 30 and a criminal history category of III, resulting in an advisory sentencing guidelines range of 121 to 151 months.  Shaw's offense level included a two-level enhancement for Shaw's attempt to obstruct justice by telling Iron Shield and Red Shirt not to tell on her.  The district court sentenced Shaw to 132 months' imprisonment, followed by three years of supervised release.

At Basic's sentencing hearing, the district court calculated a total offense level of 28 and a criminal history category of III, resulting in an advisory sentencing guidelines range of 97 to 121 months.  It sentenced Basic to 120 months' imprisonment.  In calculating the sentences for both Shaw and Basic, the district court relied on the drug-quantity determination of seventy-seven grams contained in their presentence investigation reports.[3]

Shaw and Basic now appeal.  Basic argues that there was insufficient evidence to establish that a conspiracy existed between him and Shaw and argues that the district court clearly erred in calculating a drug quantity of seventy-seven grams. Shaw also contests the drug-quantity determination and argues additionally that the

---

[3]Each presentence investigation report determined that there were seventy-seven grams of cyclopropyl fentanyl involved in the offenses, or 770 kilograms of converted drug weight. The sentencing guidelines provide that an amount ranging between seventy and one hundred grams of a fentanyl analogue, such as a mixture containing cyclopropyl fentanyl, equates to an amount between 700 and 1,000 kilograms of converted drug weight.  U.S.S.G. § 2D1.1(c); § 2D1.1 cmt. n.8(D). And this drug quantity results in a base offense level of 28.  *Id.*

two-level sentencing enhancement for obstruction was improper.  We address each argument in turn.

We begin with Basic's sufficiency-of-the-evidence argument concerning his conspiracy conviction.  "We review de novo the sufficiency of the evidence, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences." *United States v. Blaylock*, 421 F.3d 758, 772 (8th Cir. 2005).  We will not disturb the jury's verdict unless "no reasonable construction of the evidence" will support it.  *United States v. Hickman*, 764 F.3d 918, 924 (8th Cir. 2014).

To conclude that Basic was engaged in a conspiracy with Shaw, a jury must find that (1) Shaw and Basic reached an agreement to distribute or possess with intent to distribute a controlled substance, (2) Basic voluntarily and intentionally joined the agreement, and (3) at the time he joined the agreement, Basic knew its essential purpose.  *See United States v. Walker*, 688 F.3d 416, 421 (8th Cir. 2012).  "The government may prove an agreement wholly by circumstantial evidence or by inference from the actions of the parties."  *United States v. Jimenez-Villasenor*, 270 F.3d 554, 558 (8th Cir. 2001).  Granted, "proof of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy . . . ."  *United States v. Conway*, 754 F.3d 580, 591 (8th Cir. 2014).  But a reasonable jury could find that Basic had more than a buyer-seller relationship with Shaw "if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers."  *See id.* at 592.

The circumstantial evidence here is sufficient to establish that Basic voluntarily and intentionally reached an agreement with Shaw to distribute a controlled substance and, at the time of joining, knew the essential purpose of the agreement.  For example, Otremba testified that he overheard multiple conversations between Shaw and Basic about their efforts to sell the fentanyl nasal spray.  In addition, Otremba testified that Basic directed him to collect water bottles containing unidentified liquid from Shaw's mother's apartment and that Basic told him to send

money to Shaw's PayPal account in exchange for the fentanyl solution. Furthermore, Shaw and Basic jointly distributed fentanyl spray to Otremba multiple times. Once, while all three were shopping together, Otremba asked Basic for some nasal spray, Basic then asked Shaw for the spray, and Shaw retrieved it from her purse and handed it to Basic to give to Otremba. In view of this testimony, sufficient evidence supported the finding that Shaw and Basic were engaged in a conspiracy to distribute cyclopropyl fentanyl. *See United States v. Cooke*, 853 F.3d 464, 475 (8th Cir. 2017) (determining that circumstantial evidence established a conspiracy based on, *inter alia*, communications between two people about selling methamphetamine and payments between those people for controlled substances).

Next, Basic and Shaw both argue that the district court clearly erred in calculating a drug quantity of seventy-seven grams of fentanyl analogue. "The district court's drug quantity and identity determinations are factual findings, which we review for clear error, applying the preponderance-of-the-evidence standard." *Walker*, 688 F.3d at 420 (internal quotation marks omitted). We "will overturn a finding of drug quantity only if the entire record definitively and firmly convinces us that a mistake has been made." *United States v. Quintana*, 340 F.3d 700, 702 (8th Cir. 2003) (internal quotation marks omitted).

Before attributing to one defendant a quantity of drugs sold by a co-conspirator, a district court must "find by a preponderance of the evidence" that the transaction was (1) "in furtherance of the conspiracy" and (2) either known to the defendant "or reasonably foreseeable to him." *United States v. Alexander*, 408 F.3d 1003, 1009-10 (8th Cir. 2005); *see* U.S.S.G. § 1B1.3(a)(1)(B). In calculating this quantity, "the factfinder may consider drug amounts from transactions" that the defendant was not directly involved in, so long as those transactions were "part of the same course of conduct or scheme." *Id.* at 1010.

Basic argues that the quantities sold by Shaw to Iron Shield cannot be attributable to him because they were not reasonably foreseeable by him, were not within the scope of the conspiracy, and were not in furtherance of the conspiracy.

But Otremba testified that he heard multiple conversations between Basic and Shaw about selling the fentanyl nasal spray. Specifically, he heard Shaw tell Basic that she needed to "make money off of" selling the drug. Therefore, it would have been reasonably foreseeable to Basic that Shaw would attempt to increase sales by distributing the drug to others, even if Basic did not personally know Iron Shield or Red Shirt. *See United States v. Flores*, 73 F.3d 826, 834 (8th Cir. 1996) (finding that a codefendant was responsible for other drug quantities distributed by co-conspirators when there was no evidence to suggest that his "initial agreement to join, and subsequent involvement in, the joint criminal conduct was clearly defined . . . as limited to the specific criminal act(s)" in which the codefendant personally participated). Thus, the district court did not clearly err in holding that a preponderance of the evidence supported finding that Shaw's fentanyl nasal spray transactions with Iron Shield were attributable to Basic.

In addition, turning to the drug quantity calculated, the trial evidence was sufficient for the district court to "approximate [a] quantity" that amounted to at least seventy-seven grams of fentanyl analogue. *See Walker*, 688 F.3d at 421. To determine properly the applicable drug quantity in a conspiracy, a sentencing court "shall approximate the quantity of the controlled substance[s]" for sentencing purposes if the amount of drugs seized does not reflect the scale of the offense. *Id.* In so doing, "[t]he court may make a specific numeric determination of quantity based on imprecise evidence" and without regard to the admissibility of the evidence. *United States v. Roach*, 164 F.3d 403, 413-14 (8th Cir. 1998). In making these determinations, the sentencing court has wide discretion as to the kind of information it may consider or its source, including trial evidence. *United States v. Lawrence*, 854 F.3d 462, 467 (8th Cir. 2017).

The nasal spray bottle confiscated from Iron Shield at the halfway house was found to contain 11.69 grams of a solution containing cyclopropyl fentanyl. Because testimony established that several of Shaw's and Basic's other transactions involved nasal spray bottles, it was reasonable for the district court to "approximate the quantity" of those other nasal spray bottles as 11.69 grams. *See Walker*, 688 F.3d at

421. Iron Shield testified that she received multiple nasal spray bottles from Shaw and refilled them at Shaw's apartment "two or three times," amounting to roughly four nasal-spray-bottle-sized amounts. Otremba also testified that the same day that Droske stopped him, Basic had filled a spray bottle belonging to Otremba with a fentanyl solution. On another occasion, Otremba paid forty dollars for a separate quantity of fentanyl solution that Basic poured from a bottle belonging to Shaw into Otremba's spray bottle. In addition to these incidents involving nasal spray bottle-sized quantities, Otremba testified that he retrieved a water bottle containing approximately two inches of liquid from Shaw's apartment. Otremba then brought the bottle to Basic at his apartment, later testifying that Basic usually obtained the fentanyl from Shaw and that he and Basic would refer to the nasal spray as "water bottle" or "Dasani water" when they were talking in code. Furthermore, Iron Shield and Otremba both testified to receiving several sprays of the fentanyl solution from Shaw and Basic on multiple occasions. Therefore, there were likely at least six nasal-spray-bottle quantities, two inches of solution in a water bottle, and various individual sprays involved in Shaw and Basic's transactions. In light of this testimony, seventy-seven grams is a reasonable approximation of the drug quantity. *See United States v. Robertson*, 883 F.3d 1080, 1083 (8th Cir. 2018) (noting that, where not all the drugs have been seized, the district court's measurements need not be precise if the record reflects a basis for the court's approximation). Thus, the district court did not clearly err in calculating the drug quantity.

Lastly, Shaw argues that the district court's decision to apply a two-level sentencing enhancement for obstruction of justice was not supported by the trial evidence. "The district court must find the predicate facts supporting an enhancement for obstruction of justice by a preponderance of the evidence, and we review those findings for clear error." *United States v. Yarrington*, 634 F.3d 440, 452 (8th Cir. 2011). "We give great deference to a district court's decision to impose an obstruction of justice enhancement, reversing only when the district court's findings are insufficient." *Id.*

A district court may apply an obstruction-of-justice enhancement to a defendant's base offense level if "the defendant willfully obstructed . . . or attempted to obstruct . . . the administration of justice" with respect to the investigation or prosecution "of the instant offense of conviction" and the obstruction related to the "defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The commentary to § 3C1.1 defines obstruction to include "unlawfully influencing" a witness. *Id.* at cmt. n.4(A). Therefore, attempts to prevent others from communicating evidence of wrongdoing to law enforcement officers can constitute obstruction of justice. *See United States v. Gaye*, 902 F.3d 780, 788 (8th Cir. 2018) (noting that attempts to discourage a witness from testifying implicate the federal witness tampering statute, 18 U.S.C. § 1512(b)(1), which forbids persuading another person with an intent to delay or prevent testimony, and therefore can amount to obstruction for purposes of the enhancement).

The district court did not clearly err in finding by a preponderance of the evidence that Shaw attempted to obstruct justice. Iron Shield and Red Shirt both testified that Shaw told them "not to tell on her" while they were in a holding cell together after drugs had been discovered at the halfway house. In a similar case, we found that a defendant obstructed justice when he told a witness that her statements relating to a domestic assault charge "need[ed] to go away." *United States v. Sanders*, 956 F.3d 534, 540-41 (8th Cir. 2020) (noting that the defendant's argument that the comment was "too ambiguous" to warrant an obstruction enhancement was insufficient to overcome deference to the district court). Shaw's comment to Iron Shield and Red Shirt is distinguishable from cases where the enhancement was not applied because a defendant's statements were "somewhat ambiguous," such as when a defendant asked a witness to "stay strong" and "be quiet." *See United States v. Emmert*, 9 F.3d 699, 704-05 (8th Cir. 1993). Shaw's statement is closer to that in *Sanders* because it is a direct attempt to stifle incriminating testimony. *See* 956 F.3d at 540-41. Thus, the district court did not clearly err in applying the obstruction-of-justice enhancement to Shaw's offense level.

For the foregoing reasons, we affirm.[4]

_____

[4]On March 26, 2020, Basic filed a *pro se* letter addressed to this court raising various issues. "It is Eighth Circuit policy not to address issues raised by a defendant in pro se filings with this Court when he is represented by counsel." *United States v. Carr*, 895 F.3d 1083, 1090 (8th Cir. 2018). We therefore decline to address Basic's *pro se* arguments.