# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-3205

_____

United States of America

*Plaintiff - Appellee*

v.

Timothy James Burns

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 21, 2020
Filed: March 8, 2021

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

SMITH, Chief Judge.

A jury convicted Timothy Burns of wire fraud under 18 U.S.C. § 1343. Burns makes five arguments on appeal: (1) the evidence against him was insufficient, (2) the district court's[1] willful-blindness instruction was improper, (3) the jury instruction

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

impermissibly varied from the indictment, (4) the district court erred by not giving an explicit unanimity instruction, and (5) the district court erred by not sua sponte individually polling the jury. We affirm.

## I. *Background*

Tobias Ritesman operated Ritesman Enterprises, Inc., which, in turn, was the parent company of Global Aquaponics, Inc., and South Dakota Food Security, LLC (SDFS). Global and SDFS purportedly intended to build an aquaponics facility worth $11 million.[2] Global was to own 51 percent of the facility and contribute $5.6 million to the project. SDFS was to own 49 percent of the facility and contribute $5.4 million to the project. SDFS planned to raise its portion by selling shares. Thus, it created a private placement memorandum, which detailed the purported project and investment opportunities for potential investors.

Burns entered the picture as Global's chief operating officer and the general contractor for construction on the aquaponics facility. Burns hired two people, Jeremiah Charlson and Gregg Selberg, to find investors for SDFS to accumulate SDFS's $5.4 million contribution. Burns instructed Charlson and Selberg to use the private placement memorandum in their presentations to investors. Burns also gave Charlson and Selberg additional information not included in the private placement memorandum to tell investors. For example, Burns told Charlson and Selberg that Global already had its $5.6 million contribution either on hand or in assets; it had purchased land for the facility; it had secured contracts to sell fish and produce; and the project had a funded bond from the State of South Dakota. But none of these representations were true. Defrauded investors later testified they relied on these statements when deciding to invest.

---

[2]Aquaponics combines aquaculture (raising and breeding aquatic animals) and hydroponics (growing plants without soil), using the aquatic animals to fertilize water for the plants and the plants to purify it for the aquatic animals. *Auqaponics*, Oxford English Dictionary (3d ed. 2012).

Burns operated other unrelated businesses. Burns's other businesses experienced financial troubles during the time he promoted Global and SDFS. Thus, Burns took investor funds intended for SDFS and used them to cover expenses related to his other businesses. Burns or his bookkeeper, Jackie Voelker, would transfer the money from SDFS's or Global's accounts to Burns's other businesses.

Charlson and Selberg eventually became suspicious of Burns. They noticed Burns was visibly stressed and would offer them double commission if they got a new investor within a day. During this time, they also saw Burns looking at negative bank accounts for SDFS. The company's apparent insolvency concerned them given their successful efforts to secure investors. Charlson and Selberg knew they had raised $200,000 to $300,000 for SDFS and been told Global had $5.6 million ready. So Charlson and Selberg discussed their concerns with Voelker. Voelker informed the two that SDFS's bank account was empty. The three decided to meet with Ritesman, the supposed originator of the project. Ritesman replied to their concerns by saying he would talk to Burns. Then, Charlson and Selberg decided to confront Burns directly. Burns claimed that he was entitled to a $1 million down payment as general contractor and that the transfers were simply advances for that sum. No one, however, had heard about or seen a contract for the purported down payment. Burns later showed them a contract addressing the down payment. Burns had drafted the contract himself and signed it as the chief operating officer of Global and as president of one of his other businesses.

After the confrontation, the scheme unraveled. SDFS filed a statement of dissociation from Burns. And several months later, the Federal Bureau of Investigation (FBI) interviewed Burns for his involvement with the scheme.

After the FBI investigation, a grand jury indicted Burns and Ritesman for wire fraud under 18 U.S.C. § 1343. Ritesman pleaded guilty. Burns went to trial. At trial, following the close of the evidence, the district court gave an actual-knowledge and

a willful-blindness jury instruction for the intent element. It also gave the remainder of the wire-fraud instruction. Burns's counsel objected to the instruction, arguing it constructively amended or varied from the indictment to an impermissible degree. The district court overruled the objection, concluding that the wire-fraud jury instruction did not constructively amend the indictment or constitute a variance. In April 2019, Burns was convicted and sentenced. Burns timely appealed.

## II. *Discussion*

Burns makes five arguments on appeal: (A) the evidence against him was insufficient, (B) the district court's willful-blindness instruction was improper, (C) the jury instruction impermissibly varied from the indictment, (D) the district court erred by not giving an explicit unanimity instruction, and (E) the district court erred by not sua sponte polling the jurors individually.

## A. *Sufficiency of the Evidence*

Burns argues that there was insufficient evidence to find him guilty under the willful-blindness theory submitted to the jury. Burns did not, however, move for acquittal based on insufficient evidence at trial. Consequently, we review for plain error the district court's decision to not sua sponte grant acquittal based on insufficiency of evidence. *United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013). To prevail, Burns must show (1) there was an error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* Plain error is only present on a sufficiency claim "if there is no evidence of the defendant's guilt or the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Id.* (quoting *United States v. Villasenor*, 236 F.3d 220, 222 (5th Cir. 2000)).

Under § 1343, "the government must prove (1) intent to defraud, (2) participation in a scheme to defraud, and (3) the use of a wire in furtherance of the

fraudulent scheme." *United States v. Roberts*, 881 F.3d 1049, 1052 (8th Cir. 2018). The government can establish the intent element by showing Burns had actual knowledge or was willfully blind. *See United States v. Hansen*, 791 F.3d 863, 868 (8th Cir. 2015). Burns focuses his challenge on the intent element. Specifically, Burns argues that there was insufficient evidence to show he was willfully blind. Willful blindness exists when "(1) the defendant . . . subjectively believe[s] that there is a high probability that a fact exists and (2) the defendant . . . take[s] deliberate actions to avoid learning of that fact." *Id.* (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). We conclude that the evidence presented at trial was sufficient. The government presented ample evidence of guilt. And, on this record, the jury's conviction is not at all shocking.

First, Burns represented that Global had $5.6 million on hand or in assets for the aquaponics facility. When Charlson asked Burns for specifics on Global's expenditures, he told Charlson and Selberg that investors should be notified of Global's money and expenditures on the project. Burns then repeated the falsehood of Global's $5.6 million during a meeting with potential investors. Global did not have the money and had not made any purchases for the facility. Burns, as Global's chief operating officer and general contractor for the facility, managed Global's day-to-day operations, had access to Global's bank accounts, and would have been aware of purchases being made for the facility through those accounts. Nevertheless, he claimed to have "no idea of [Global's] overall financials." Trial Tr., Vol. IV, at 704, *United States v. Burns*, No. 4:18-cr-40001-KES-2 (D.S.D. 2019), ECF No. 186-3.

Second, Burns told Charlson and Selberg that contracts had been made to sell the facility's fish and produce and that investors should be notified. But there were no such contracts. At trial, Burns admitted he was not involved in contract negotiations and had never heard the person who was in charge of sales state that there were contracts.

-5-

Third, Burns participated in a groundbreaking ceremony with local officials on land supposedly purchased for the facility's construction. The land, in fact, had not been purchased. Burns knew this and also knew that they had only paid $15,000 earnest money towards the $200,000 purchase price.

Fourth, Burns transferred investor money from SDFS's accounts to his own struggling businesses' accounts. Burns represented to others he could do whatever he wished with the investor money. Burns claimed his expenditures were an advance on the $1 million down payment he was to receive from Ritesman, which was allegedly based on the contract Burns drafted and signed for both parties to the purported contract. Instead of spending the hundreds of thousands of investor dollars on purchasing the land or moving forward on construction, he transferred it to his other businesses and made payment for "some preliminary dirt work." Trial Tr., Vol. IV, at 717.

This evidence was more than sufficient for the jury to have found Burns either had actual knowledge or was willfully blind. First, the jury could have found that Burns had actual knowledge that there were no contracts or was no land acquisition. Burns, however, told Charlson and Selberg there were contracts for the projects when he had never been told such contracts actually existed. Further, Burns participated in the groundbreaking ceremony but knew the land was not purchased because he had paid the earnest money, not the contract price. Second, the evidence showed that Burns either knew Global did not have the $5.6 million, or that he, as chief operating officer and general contractor, was willfully blind to the lack of expenditures from Global's accounts. No one knew better than Burns that the facility project, at best, languished. And Burns transferred SDFS investor money into his businesses' accounts without telling anyone. But Burns claimed to have no knowledge of Global's overall financials.

Burns's citation to *United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992), is unpersuasive. In *Barnhart*, we held that when there is "evidence of either actual knowledge or no knowledge" but no evidence of "purposely avoid[ing]" knowledge, a willful-blindness instruction is improper. *Id.* at 651–52. In that case, Barnhart knew only that the company was having financial issues but was still operating, and he had received financial statements without a trace of impropriety. *Id.* at 652. Thus, he had "failed to investigate," but no more. *Id.* That evidence was too little to find him willfully blind. But, here, Burns had access to Global's accounts, was chief operating officer of Global, and was general contractor of the aquaponics facility. He knew that Global had claimed to have spent $5.6 million, though no meaningful progress had been made on the facility. He nevertheless told others that Global had spent the money on the project, while claiming to have no knowledge of Global's overall financials. This was not a simple failure to investigate, as in *Barnhart*. Instead, Burns made representations that were contradicted by facts he had access to and that would have been obvious to anyone in his position; the company he worked for as chief operating officer and general contractor claimed to have spent $5.6 million but had nothing to show for it. Burns's response was that he did not know about his company's financials. He either knew or buried his head in the sand. *See United States v. Sigillito*, 759 F.3d 913, 939 (8th Cir. 2014) ("[I]f reasonable inferences support a finding the failure to investigate is equivalent to burying one's head in the sand, the jury may consider willful blindness as a basis for knowledge." (quotation omitted)).

The district court did not err, much less plainly err, when it did not sua sponte acquit Burns based on an absence of sufficient evidence.

## B. *Willful-Blindness Instruction*

Burns next argues that the district court erred by instructing the jury on willful blindness. We review the district court's inclusion of the instruction for an abuse of discretion. *United States v. Atkins*, 881 F.3d 621, 627 (8th Cir. 2018). A willful-

blindness jury instruction is particularly relevant in a case where the defendant "assert[s] a lack of guilty knowledge in the face of immense evidence supporting an inference of deliberate indifference." *Id.* This is that case. As discussed above, Burns claimed to have no knowledge of Global's financials. But Burns had access to Global's accounts, which showed that Global had not spent $5.6 million. In addition, Burns served as the general contractor for the aquaponics facility, where no construction was completed nor equipment delivered. Like in *Atkins*, "[e]ven if the jury believed [Burns's] implausible explanation that he had no knowledge of the criminal activity . . . , 'there was sufficient evidence that he deliberately turned a blind eye to . . . clearly illicit activity to warrant' a willful blindness instruction." *Id.* (fourth alteration in original) (quoting *United States v. Novak*, 866 F.3d 921, 927 (8th Cir. 2017)). The district court did not abuse its discretion.

## C. *Variance*

Burns challenges the wire-fraud jury instruction as an impermissible variance from the indictment. His challenge fails.[3] There is a variance "when the evidence presented proves facts that are 'materially different from those alleged in the indictment.'" *United States v. Johnson*, 719 F.3d 660, 668 (8th Cir. 2013) (quoting *United States v. Buchanan*, 574 F.3d 554, 564 (8th Cir. 2009)). Even then, a variance is only reversible "if the variance infringed a defendant's substantial rights." *Id.* at 669 (quoting *United States v. Ghant*, 339 F.3d 660, 662 (8th Cir. 2003)). This is because "[a] variance is harmless error if it does not prejudice a defendant's right to notice." *Id.* at 668 (quoting *United States v. Farish*, 535 F.3d 815, 822 (8th Cir. 2008)). Burns's substantial rights were infringed if he "could not reasonably have

---

[3]We recently explained that our precedent conflicts as to the standard of review when an appellant challenges the jury instruction as impermissibly varying from the indictment. *United States v. Shavers*, 955 F.3d 685, 693–94 (8th Cir. 2020). We need not address the conflict here because we affirm, whether we review de novo or for an abuse of discretion.

anticipated from the indictment the evidence to be presented against him." *Id.* at 669 (quoting *United States v. Pizano*, 421 F.3d 707, 720 (8th Cir. 2005)).[4]

Burns argues that the indictment misled him and his counsel into believing that the government had to prove that both Burns and Ritesman committed wire fraud in order to find Burns guilty. The indictment was not misleading. The indictment sufficiently informed Burns that he would be standing trial for his own misconduct. True, the indictment charged "the Defendants, Tobias Ritesman and Timothy Burns," with violating § 1343 and stated that Burns and Ritesman had worked together to perpetuate wire fraud. Redacted Indictment at 1, *United States v. Burns*, No. 4:18-cr-40001-KES-2 (D.S.D. 2018), ECF No. 2. But both § 1343 and its model jury instruction are phrased in the singular, making clear that the government had to prove that Burns alone, not Burns and Ritesman together, violated § 1343.[5] At trial, the evidence correctly focused on Burns because Ritesman had already pleaded guilty. Even so, to the extent the evidentiary focus shifted to Burns, it still tracked the allegations in the indictment pertinent to Burns. Burns could have readily anticipated the trial's focus, and he suffered no injury to his substantial rights due to a lack of notice.

---

[4]The other two ways to show an infringement, which are irrelevant here, are when "the indictment is so vague that there is a possibility of subsequent prosecution for the same offense" and when "the defendant was prejudiced by a 'spillover' of evidence from one conspiracy to another." *Johnson*, 719 F.3d at 669 (quoting *Pizano*, 421 F.3d at 720).

[5]Section 1343 uses the singular term *whoever*. 18 U.S.C. § 1343 ("*Whoever*, having devised or intending to devise any scheme or artifice to defraud . . . .") (emphasis added)). Section 1343's model jury instruction uses the singular term *defendant*. Eighth Cir. Model Crim. Jury Instr. 6.18.1343 (2020) ("*One*, the defendant . . . ; *Two*, the defendant . . . ; *Three*, the defendant . . . .").

We have found the same in similar situations where the defendant argued that the indictment was constructively amended by the evidence or jury instructions. For example, in *United States v. Spencer*, 592 F.3d 866 (8th Cir. 2010), the defendants were indicted for "conspir[ing] *with each [other]* and with others." *Id.* at 873 (second alteration in original) (emphasis added). The jury instruction stated that each defendant conspired "with at least one other person," whether or not "that other person is a defendant or named in the indictment." *Id.* The defendants argued that the indictment was constructively amended "because the indictment required the jury to find the defendants guilty of the crime of conspiracy *with each other*," while the jury instruction allowed the jury to find them "guilty of simply conspiring with *any other person*." *Id.* (first emphasis added). We rejected that argument because it is well settled that if one of the defendants was "acquitted, [the other] could be convicted for conspiring with others." *Id.* In the same way, § 1343 required only that Burns commit wire fraud. It did not require that Burns plus Ritesman (or anyone else) commit wire fraud. That fact makes this an easier case than *Spencer* because, unlike conspiracy, no statutory elements require Burns to have coordinated with anyone. He could have been convicted, even if he worked alone.

Thus, the district court did not err by giving a jury instruction that enabled a finding that only Burns committed wire fraud.

### D. *Unanimity Instruction*

Burns also argues that the district court should have sua sponte given an explicit unanimity instruction. This court reviews the "district court's decision not to give a specific unanimity instruction" for clear error. *United States v. Gruenberg*, 989 F.2d 971, 975 (8th Cir. 1993).

We addressed a similar set of facts in *Gruenberg*. In *Gruenberg*, the defendant was convicted of wire fraud. *Id.* at 972. The jury instructions did not include an explicit unanimity requirement. *Id.* at 975. We held that there was no genuine risk of

the jury voting nonunanimously because (1) the district court did not give a nonunanimity instruction and (2) the district court explicitly instructed the jury to be unanimous while reading the jury instructions. *Id.* "[T]he mere fact . . . that an instruction could conceivably permit a jury to reach a non-unanimous verdict [was] not sufficient to require reversal . . . ." *Id.* (second alteration in original) (quoting *United States v. Hiland*, 909 F.2d 1114, 1139 (8th Cir. 1990)). The same is true here: (1) the district court did not give a nonunanimity instruction, (2) the district court told the jury it needed to find unanimously while reading the instructions, (3) the final jury instructions mentioned that the jury should reach a unanimous verdict, (4) the verdict form stated that the jury found unanimously, and (5) the district court asked the jury if it reached a unanimous verdict before it read the guilty verdict.

Burns also urges that the district court should have defined *negligence* and *recklessness* to avoid a potential nonunanimous verdict about whether he acted with willful blindness, instead of some other mens rea. In essence, he complains that, although the district court defined what willful blindness *is*, it should have defined what it *is not*. But we presume that the jury followed the district court's instructions. *United States v. Thomas*, 877 F.3d 1077, 1079 (8th Cir. 2017) (quoting *United States v. Myers*, 503 F.3d 676, 683 (8th Cir. 2007)). Thus, we find no reasonable basis to conclude that the jury strayed from the district court's definition of willful blindness. We held similarly in *Thomas*, which had closer facts than are present here. After trial, the jury in *Thomas* said that it thought the defendant's "actions were negligent," but the statute and jury instructions required a finding that the defendant acted "intentionally, knowingly, or recklessly." *Id.* Even so, this court held that the presumption that the jury followed the instructions was not rebutted. *Id.*

Under either argument, there was no genuine risk of the jury finding nonunanimously. Thus, the district court did not clearly err.

## E. *Individual Polling*

Finally, Burns argues that the district court erred by not sua sponte individually polling the jury. But we have repeatedly held that if a defendant does not raise a polling issue below, it is waived. *United States v. Harris-Thompson*, 751 F.3d 590, 598 (8th Cir. 2014) ("[I]t is well settled that a poll under [Criminal] Rule 31(d) is not required unless requested and is waived if the request is not timely." (alterations in original) (quoting *Hiland*, 909 F.2d at 1138–39)).

After the verdict was read, the district court asked the jury to raise their hands if they agreed with the verdict. All 12 members did. The district court then asked Burns's counsel if he wanted an individual poll of the jurors. Burns's counsel replied, "No, your Honor." Trial Tr., Vol. V, at 823, *United States v. Burns*, No. 4:18-cr-40001-KES-2 (D.S.D. 2019), ECF No. 186-4. Thus, Burns did not raise the issue below, so it is waived on appeal.

## III. *Conclusion*

We, therefore, affirm the district court.

_____