# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-2904

_____

United States of America

*Plaintiff - Appellee*

v.

Salvador Magana Madrigal, Jr.

*Defendant - Appellant*

_____

No. 23-3768

_____

United States of America

*Plaintiff - Appellee*

v.

Anahi Plascencia Cardona

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: December 18, 2024
Filed: May 2, 2025

_____

Before SMITH, GRUENDER, and STRAS, Circuit Judges.

_____

SMITH, Circuit Judge.

This is a consolidated appeal of two drug coconspirators' cases. Salvador Madrigal Jr. and Anahi Cardona were both convicted of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 1956(h). Madrigal and Cardona both appeal the sufficiency of the evidence, and Cardona also argues that the district court[1] admitted improper testimony, erred in calculating her drug quantity at sentencing, improperly denied her safety-valve relief, and created an unwarranted sentencing disparity between her and her codefendants. We affirm.

## I. *Background*

In early 2020, the Sioux Falls Police Department initiated an investigation into Robin Vensand (Robin) and Lanny Vensand (Lanny) based on information that they were engaged in methamphetamine distribution. Surveillance of the Vensands' residence revealed short-term traffic patterns consistent with drug transactions. Subsequent traffic stops of individuals leaving their property resulted in several drug seizures, including 90 grams of methamphetamine from a single vehicle. By August 2020, police received intelligence that the Vensands were anticipating a substantial methamphetamine shipment of approximately 50–100 pounds. A search warrant executed at their residence yielded 844 grams of methamphetamine and approximately $27,000 in cash.

As the investigation expanded, the Drug Enforcement Administration (DEA) joined the efforts to identify the Vensands' methamphetamine supplier. Analysis of

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

phone records from devices seized from the Vensands revealed communications with Madrigal's brother, Oscar Madrigal (Oscar). An anonymous tip provided additional information that Madrigal and Oscar were distributing large quantities of methamphetamine and concealing drugs in vehicles at apartment complexes.

The investigation uncovered a sophisticated drug transportation network orchestrated by Madrigal, who arranged methamphetamine shipments from California to South Dakota. Madrigal employed multiple couriers, including William Hartwick and Maria Magana-Zavala (Maria). Hartwick and Maria conducted approximately seven trips transporting narcotics between the two states. In her testimony, Robin stated that she had purchased between 150–250 pounds of methamphetamine from Madrigal, with payments totaling over $1 million. Cardona, Madrigal's wife, assisted in coordinating transportation logistics, including arranging accommodations for the couriers.

The operation extended beyond drug trafficking to include organized money laundering activities. Madrigal, Cardona, and Madrigal's mother, Rosa Madrigal (Rosa), structured bank deposits under $10,000 to circumvent federal reporting requirements. They transferred funds between Wells Fargo accounts to obscure the origins of the drug proceeds. Rosa would deposit cash into her account and subsequently write checks to Madrigal and Cardona. The group also conducted wire transfers to individuals in Mexico through the money transfer service Remitly. Neither Madrigal nor Cardona were employed during this period, yet total deposits across their accounts exceeded $549,000.

Warrant-authorized searches at Madrigal and Cardona's residence produced substantial drug trafficking evidence. This included $215,320 in cash, drug packaging materials, multiple phones, and a ledger containing drug trafficking records. The search also revealed a note with Robin's name and address.

A federal grand jury indicted Madrigal for conspiracy to distribute methamphetamine and conspiracy to commit money laundering. Cardona, however,

was initially charged only with conspiracy to commit money laundering. A superseding indictment was issued that added the methamphetamine conspiracy charge against Cardona. Both defendants pleaded not guilty.

At trial, the prosecution presented 18 witnesses and introduced 71 exhibits. Several of Madrigal and Cardona's codefendants testified against them. Oscar testified that (1) both Madrigal and Cardona gave instructions to Hartwick and Maria regarding their trips to California to pick up drugs; (2) Cardona told Oscar that she could handle the drug business if Madrigal was gone; and (3) Cardona had a management role in the drug operation. Hartwick testified that Cardona called Maria during their trips to give instructions for destinations and travel accommodations. Cardona instructed Maria in Spanish. Maria, in turn, would translate to English for Hartwick. At trial, Cardona objected to Hartwick's testimony about Cardona's statements to Maria as hearsay. The district court overruled the objection and admitted them as statements made in furtherance of the conspiracy. Hartwick also testified that he and Maria confronted both Cardona and Madrigal about their discovery of methamphetamine after their fifth trip to California. Despite this confrontation, Cardona continued to direct Hartwick and Maria on their drug runs to California.

Neither defendant moved for judgment of acquittal. Both testified in their own defense. Madrigal's narrative differed from the government's version of events. He claimed that the Sinaloa Cartel coerced him into methamphetamine trafficking after he became indebted to El Chapo's brother for $300,000. He testified that he initially only sold marijuana but was later forced into methamphetamine distribution through threats, including kidnapping and having guns held to his head. Madrigal asserted that he derived no profit from methamphetamine sales as all proceeds were directed toward his cartel debt. He did acknowledge spending marijuana proceeds to fund his lifestyle, including expensive vehicles and trips to Mexico. He also admitted to directing Hartwick and Maria to transport drugs but claimed that he misled them by describing the substances as "white marijuana."

-4-

Cardona similarly offered an alternative account during her testimony. She described Madrigal as a controlling spouse who demanded complete obedience and threatened to take their children if she defied him. She stated that Madrigal initially told her that their income derived from family loans before later acknowledging the marijuana-sales revenue. But she testified that he concealed the methamphetamine trafficking from her. Cardona admitted to making bank deposits and arranging accommodations for couriers at Madrigal's direction. But she maintained that she believed these activities only involved marijuana distribution. She denied any direct involvement with methamphetamine and claimed no knowledge of conversations regarding methamphetamine trafficking. She, however, acknowledged her participation in money laundering and marijuana distribution.

The court instructed the jury regarding Madrigal's coercion defense. The instruction provided that Madrigal could establish coercion but only if he could show the following: (1) his participation in the criminal conspiracy stemmed from a reasonable fear of immediate bodily harm, (2) he did not recklessly place himself in the situation, (3) he had no reasonable legal opportunity to avoid the harm, and (4) he reasonably anticipated a causal relationship between committing the criminal acts and avoiding the threatened harm. The jury returned guilty verdicts against both defendants on all counts.

Madrigal was sentenced to 400 months' imprisonment on the methamphetamine count and 240 months' imprisonment on the money laundering count, to be served concurrently. At Cardona's sentencing, she argued that she was entitled to safety-valve relief. She argued that she had truthfully provided all the information she had concerning the charges. The district court, however, found her credibility lacking. The court found it implausible that she had no knowledge of the methamphetamine conspiracy and denied her safety-valve relief. Cardona also argued that the district court improperly attributed 774.5 grams of methamphetamine recovered from the Vensands' home to her. The district court found that the drugs could be attributed to her due to her extensive involvement in the drug conspiracy. Cardona was ultimately sentenced to 265 months' imprisonment on the

methamphetamine count and 240 months' imprisonment on the money laundering count, also to run concurrently. Robin, Lanny, Hartwick, Maria, Rosa, and Oscar were also convicted on their charges. They received 235, 262, 70, 70, 120, and 60 months' imprisonment, respectively.

## II. *Discussion*

On appeal, Madrigal challenges only the sufficiency of the evidence as to his methamphetamine conspiracy charge and money laundering conspiracy charge. He argues on appeal, as he did at trial, that he was forced to join the conspiracies due to threats placed on him and his family by the cartel. Cardona also challenges the sufficiency of the evidence supporting her methamphetamine conspiracy charge. She argues that the evidence was insufficient to show that she was aware of the methamphetamine conspiracy. Cardona also argues that the district court erred by admitting Hartwick's testimony because it was inadmissible hearsay. For her third argument, Cardona asserts that the court miscalculated the quantity of methamphetamine attributable to her at sentencing. Cardona denies knowledge of a methamphetamine conspiracy and asserts that she only had one interaction with the Vensands. She also contends that the district court incorrectly denied her safety-valve relief due to her knowledge of the conspiracy. Last, she avers that her sentence created an unwarranted disparity between her and her codefendants.

### A. *Madrigal*
#### 1. *Sufficiency of the Evidence*

Madrigal's sufficiency argument that the district court should have sua sponte granted judgment of acquittal will be reviewed for plain error. *United States v. Burns*, 990 F.3d 622, 626 (8th Cir. 2021). To succeed, Madrigal must show that "(1) there was an error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* (cleaned up). On a sufficiency claim, plain error can only be shown "if there is no evidence of the defendant's guilt or the evidence on a key

element of the offense was so tenuous that a conviction would be shocking." *Id.* (quoting *United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013)).

To prove that Madrigal conspired to distribute methamphetamine, the government was required to show "that there was an agreement to distribute drugs, that the defendant knew of the conspiracy, and that the defendant intentionally joined the conspiracy." *United States v. Ramirez*, 21 F.4th 530, 532 (8th Cir. 2021) (quoting *United States v. Davis*, 826 F.3d 1078, 1081 (8th Cir. 2016)). This may be shown "wholly by circumstantial evidence or by inference from the actions of the parties." *United States v. Jimenez-Villasenor*, 270 F.3d 554, 558 (8th Cir. 2001). Even a minor role in a conspiracy is sufficient. *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014).

Madrigal's coercion argument rests entirely on his own testimony that the cartel forced him to join the conspiracy by threatening him and his family. Madrigal's credibility was for the jury to weigh. It was not bound to accept the verity of his account. "A jury is free to believe or reject a witness's testimony in part or in whole." *United States v. Fairchild*, 819 F.3d 399, 407–08 (8th Cir. 2016) (quoting *United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008)). The jury could have discredited Madrigal's testimony in part or in its entirety. *Id.* at 408.

The record contained ample evidence supporting the charged offenses. This evidence included the following: (1) Robin's testimony that, in total, she had paid Madrigal "over a million dollars" for 150–250 pounds of methamphetamine across their drug transactions, R. Doc. 259, at 109; (2) Hartwick's testimony regarding the seven trips Madrigal and Cardona had them take to transport drugs, including methamphetamine; (3) Hartwick's testimony regarding the threat Madrigal made on his, Maria's, and their family's lives; and (4) Oscar's testimony that Madrigal had Oscar drive him and a package containing methamphetamine to Robin's home. This court has previously found that evidence of multiple sales of large quantities of drugs

is sufficient to submit a case of conspiracy to distribute drugs to a jury. *United States v. Slagg*, 651 F.3d 832, 840–41 (8th Cir. 2011).

Madrigal contends that his case is similar to the defendant in *United States v. Fitz*, who was merely present for the transactions. 317 F.3d 878 (8th Cir. 2003). In *Fitz*, this court held that there was insufficient evidence to support the charge of conspiracy to distribute drugs when the defendant was only present in a vehicle containing drugs and there was no testimony that he knew about the drugs or otherwise participated. *Id.* at 882–83. *Fitz* is easily distinguishable. Here, the record established not only that Madrigal participated in the conspiracy, but also that he led it. There was no error in submitting Madrigal's charge of conspiracy to distribute methamphetamine to the jury.

To prove that Madrigal conspired to commit money laundering, the government was required to prove that Madrigal "knowingly joined a conspiracy to launder money and that one of the conspirators committed an overt act in furtherance of that conspiracy." *United States v. Pizano*, 421 F.3d 707, 725 (8th Cir. 2005) (internal quotation marks omitted). The elements of this crime are as follows:

> (1) [D]efendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to conduct the financial transaction knowing the transaction was "designed in whole or in part [] to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

*United States v. Grady*, 88 F.4th 1246, 1261–62 (8th Cir. 2023) (alterations in original) (quoting *United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008)).

Robin testified that she had personally paid Madrigal over $1 million in cash for methamphetamine and marijuana. Cardona testified that Madrigal gave her large

amounts of this cash and precise instructions on how it was to be deposited. Rosa also testified that Madrigal instructed her to take the cash, deposit it in her account, and then write checks to him or Cardona at his direction. Further, there was testimony from an IRS special agent that Madrigal and Cardona used the money transfer service Remitly to make wire transfers to people in Mexico. This agent also testified that Madrigal and Cardona were structuring cash in their accounts to avoid financial reporting requirements. In sum, Madrigal sold drugs personally to Robin for cash, provided his coconspirators with the proceeds, and directed their movement of the money between their accounts to conceal the drug conspiracy. This is sufficient for a reasonable juror to conclude that Madrigal was guilty of conspiracy to commit money laundering. *See United States v. Sainz Navarrete*, 955 F.3d 713, 719 (8th Cir. 2020).

The district court did not err, let alone plainly err, when it did not sua sponte acquit Madrigal based on a lack of convincing admissible evidence.

## B. *Cardona*
### 1. *Sufficiency of the Evidence*

Cardona, like Madrigal, did not move for acquittal based on insufficiency of evidence at the trial, so we also review this issue for plain error. Cardona contends that she had no actual knowledge of the methamphetamine conspiracy. She asserts that she believed that she and Madrigal were only involved in a marijuana conspiracy. She contends that the government failed to produce sufficient evidence produced at trial to show that she knew that the conspiracy included methamphetamine.

We disagree. The government produced ample evidence at trial for us to conclude that the district court did not err when it did not sua sponte acquit Cardona based on the sufficiency of the evidence. The following record facts suffice:

- Oscar testified that he heard conversations between Cardona and Maria regarding instructions on "what hotel to go to and [stay at]" on their trips

to California to pick up methamphetamine and marijuana. R. Doc. 259, at 167.

- Oscar testified that Cardona told Maria that "she didn't want [Oscar] to know what was going on" regarding the drug conspiracies. *Id.* at 168.

- Oscar testified that Maria and Hartwick were working as "mule[s]" for both of Madrigal and Cardona. *Id.* at 166.

- Hartwick testified that even after he learned that he was transporting methamphetamine, he continued to do so "at the direction of Salvador and Anahi [Cardona]." R. Doc. 260, at 114.

- Hartwick testified that Cardona and Madrigal were both in constant communication with him and Maria on their drug runs to California, as Cardona or Madrigal would call Maria every hour to two hours.

- Hartwick testified that it was "[Cardona]'s job" to book the hotels for their trips. *Id.* at 67.

- Hartwick testified that after he and Maria had discovered that they were transporting methamphetamine, Maria was upset and "talk[ed] to [Cardona] about [the discovery that they were transporting methamphetamine instead of marijuana]" on the phone. *Id.* at 83.

- Ultimately, both Oscar and Hartwick identified Cardona as someone who "managed" the conspiracy "together" with Madrigal. *Id.* at 16, 98.

Accordingly, there was more than enough evidence to submit Cardona's charge to a jury. The district did not err.

### 2. *Hartwick's Testimony*

Hartwick testified to several conversations made between Maria and Cardona that were then relayed to Hartwick. These conversations included instructions regarding hotels and drug pickups in California. Cardona argues that any statements made from Maria to Hartwick regarding the conversations between Maria and

Cardona were inadmissible hearsay. The government counters that these statements were not hearsay because they were made in furtherance of a conspiracy.

"[A] statement is not hearsay when it is offered against an opposing party and 'was made by the party's coconspirator during and in furtherance of a conspiracy.'" *United States v. Goodman*, 88 F.4th 764, 767 (8th Cir. 2023) (quoting Fed. R. Evid. 801(d)(2)(E)). To admit such a statement, the offering party must show "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Sims*, 999 F.3d 547, 552 (8th Cir. 2021) (quoting *United States v. Torrez*, 925 F.3d 391, 395 (8th Cir. 2019)). Our court broadly interprets the phrase "in furtherance of the conspiracy," *id.* (internal quotation marks omitted), and "[a]ny statement discussing the supply source, identifying a coconspirator's role, indicating the quantity of drugs, or providing information on the enterprise's scope furthers the conspiracy," *id.*

It is an open question whether "admissibility under 801(d)(2)(E) is reviewed under an abuse of discretion standard or whether . . . factfinding is first reviewed for clear error and the ultimate decision to admit or exclude is then reviewed for abuse of discretion." *Goodman*, 88 F.4th at 767. We need not resolve the issue in this case, however, as Cardona's argument fails under either standard. *See United States v. Ramirez-Martinez*, 6 F.4th 859, 867 (8th Cir. 2021).

The district court did not clearly err nor abuse its discretion in determining that Cardona, Maria, and Hartwick were involved in a conspiracy to distribute drugs. As discussed above, both Oscar and Hartwick testified to Cardona's involvement in the conspiracy. Likewise, the district court did not clearly err nor abuse its discretion in determining that Maria's statements to Hartwick were made in furtherance of the conspiracy. Maria's statements to Hartwick related to her conversations with Cardona that included directions and instructions connected to their role as drug mules for Cardona and Madrigal. These facts, when broadly interpreted, easily satisfy the in-furtherance component of hearsay admission under Rule 801(d)(2)(E).

### 3. *Drug Quantity*

Cardona also argues that the district court attributed an improper amount of methamphetamine to her at sentencing. We review drug quantity determinations made by the district court "for clear error, applying the preponderance-of-the-evidence standard." *United States v. Walker*, 688 F.3d 416, 420 (8th Cir. 2012) (quoting *United States v. Turner*, 603 F.3d 468, 471 (8th Cir. 2010)). We will overturn the district court's drug quantity determination only when the entire record "definitively and firmly" shows that the district court made a mistake. *United States v. Shaw*, 965 F.3d 921, 926 (8th Cir. 2020) (quoting *United States v. Quintana*, 340 F.3d 700, 702 (8th Cir. 2003)). "In a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." *Walker*, 688 F.3d at 421 (internal quotation marks omitted). A district court may attribute a drug quantity from a codefendant if it "find[s] by a preponderance of the evidence that the transaction was (1) in furtherance of the conspiracy and (2) either known to the defendant or reasonably foreseeable to him." *Shaw*, 965 F.3d at 926 (internal quotation marks omitted).

Cardona continues her argument that she was not aware of and was not a participant in the conspiracy to distribute methamphetamine. She alleges that the 774.5 grams of methamphetamine seized from the Vensands' residence was erroneously attributed to her, as she only had one interaction with Robin, which involved marijuana.

As established above, there is more than enough evidence to show that Cardona knew about the conspiracy to distribute methamphetamine and participated in it. Even if she did not personally deliver or know about the 774.5 grams of methamphetamine at the Vensands' residence, it was reasonably foreseeable that the methamphetamine she helped deliver from California would make its way to a

known drug purchaser. The district court correctly determined that these drugs could be attributed to Cardona as a member of the drug conspiracy.[2]

### 4. *Safety-valve Relief*

Cardona next argues that the district court erred in denying her safety-valve relief under 18 U.S.C. § 3553(f), which would have allowed the district court to impose Cardona's sentence below the mandatory minimum. Safety-valve relief requires the sentencing court to find that Cardona "truthfully provided to the [g]overnment all information and evidence . . . concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5).

We review the district court's findings of a defendant's safety-valve proffer for clear error. *United States v. Soto*, 448 F.3d 993, 995 (8th Cir. 2006). This "is a 'credibility finding' that '[w]e generally do not disturb.'" *United States v. Rios*, 995 F.3d 654, 658 (8th Cir. 2021) (per curiam) (alteration in original) (quoting *Soto*, 448 F.3d at 996). "In making its assessment of the truthfulness of a safety valve proffer, the district court is entitled to draw reasonable inferences from the evidence." *United States v. Alvarado-Rivera*, 412 F.3d 942, 948 (8th Cir. 2005) (en banc).

The district court denied this relief because it found that Cardona did not provide all the information she knew regarding the methamphetamine conspiracy. Cardona maintains, as she has throughout, that she was not aware of the methamphetamine conspiracy. For the reasons discussed previously, the district court did not clearly err in finding that Cardona was not only aware of the conspiracy

---

[2]The presentence investigation report also attributed 17.24 kilograms of methamphetamine to Cardona based on a suitcase seized from an Omaha storage facility. This amount would be enough to put Cardona at a base offense level of 38, which was the base offense level assigned to her by the district court, without the 774.5 grams recovered at the Vensands' home. Cardona did not challenge the amount recovered from the suitcase below or here.

but failed to disclose what she knew. Based on the evidence contained in this record, we will not disturb the district court's disbelief of Cardona's asserted ignorance.

### 5. *Sentencing Disparity*

Lastly, Cardona argues that the district court created an unwarranted sentencing disparity between her and her codefendants, rendering her sentence substantively unreasonable. We review the substantive reasonableness of a sentence "under a highly deferential abuse-of-discretion standard." *United States v. Jones*, 71 F.4th 1083, 1086 (8th Cir. 2023). "A district court abuses its discretion when it (1) 'fails to consider a relevant factor that should have received significant weight'; (2) 'gives significant weight to an improper or irrelevant factor'; or (3) 'considers only the appropriate factors but in weighing those factors commits a clear error of judgment.'" *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting *United States v. Kane*, 552 F.3d 748, 752 (8th Cir. 2009)).

After carefully reviewing the record, we conclude that the district court did not abuse its wide discretion in imposing Cardona's sentence of 265 months' imprisonment. At sentencing, the district court considered Cardona's role in the conspiracy. The court concluded that her role as coordinator and money launderer contributed to the success of the conspiracy. She played a significant role in getting the drugs from California to Sioux Falls and in getting drug sale proceeds from Sioux Falls to Mexico. The district court expressly compared Cardona's culpability to Madrigal's and to the Vensands'. It determined that she was less culpable than Madrigal and more culpable than the Vensands, and it pronounced a sentence in between them. Cardona was sentenced below her Guidelines range.

Cardona argues that she should be sentenced similar to Hartwick, Maria, and Rosa, who received between 60–70 months each, because like them, she was simply following Madrigal's orders and did not know the full extent of the conspiracy. However, the context of her sentencing was materially different than those she seeks to be compared to. "[D]isparate sentences among dissimilar defendants are not unwarranted." *United States v. Fry*, 792 F.3d 884, 893 (8th Cir. 2014) (emphasis

omitted). Unlike the Vensands and Rosa, Cardona was actively involved in moving the methamphetamine from California. Unlike the Vensands, she was actively involved in the conspiracy to launder the money. Furthermore, other than Madrigal, she was the only other member of the conspiracy to plead not guilty and thus did not receive a reduction for acceptance of responsibility.

Cardona was situated differently than other members of the conspiracy and was accordingly sentenced differently. She has not shown that difference was unjustified in the record. The district court did not abuse its discretion in imposing a sentence of 265 months' imprisonment.

### III. *Conclusion*

Based on the foregoing, we affirm the convictions and sentences of Salvador Madrigal and Anahi Cardona.

_____