# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1146
_____

United States of America

*Plaintiff - Appellee*

v.

Francisca Yadira Rios

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: December 14, 2020
Filed: April 28, 2021
[Published]
_____

Before SMITH, Chief Judge, LOKEN and MELLOY, Circuit Judges.
_____

PER CURIAM.

Francisca Yadira Rios appeals her below-Guidelines sentence of 157 months' imprisonment for conspiracy to distribute methamphetamine. She argues that the

district court[1] erred by denying her safety-valve relief and imposing an unreasonable sentence. We affirm.

## I. *Background*

Rios's brother, Fidel Rios ("Fidel") was convicted on federal drug charges. While awaiting sentencing in the Polk County Jail, Fidel attempted to set up a shipment of methamphetamine to Des Moines, Iowa. A confidential source (CS) in the jail with Fidel arranged for the recipient of the shipment to be an undercover law enforcement officer. The officer assumed the undercover persona of "Bobby." "Bobby" was to pay $235,000 in exchange for 40 pounds of methamphetamine. The CS reported that the shipment would come from Los Angeles, California, to Des Moines, Iowa, and "that Fidel's family was 'deeply involved' in the forthcoming transaction." Presentence Investigation Report (PSR) at 4, *United States v. Rios*, No. 4:18-cr-00203-SMR-HCA (S.D. Iowa. 2020), ECF No. 144.

The CS gave Fidel a phone number for "Bobby." Fidel then called Rios—his sister who lived in Washington state—and gave her "Bobby's" phone number. During a recorded jail call, Fidel told Rios that "Bobby" would travel to Los Angeles to pick up the methamphetamine.

Ultimately, the CS advised the undercover officer that the transaction would be run through Rios, also known as "Pancha." The plan was for "Bobby" to travel to Los Angeles to complete the drug transaction. The same day that the CS advised the undercover officer of the plan, Fidel—still jailed—called "Cupido" in Mexico and stated that "his 'homie was going to visit Aunt Angela.'" *Id*. "[H]omie" referred to the undercover officer known as "Bobby," and "Aunt Angela" referred to "Los Angeles." *Id*. "Cupido" told Fidel to have "Pancha" call him "because they could talk

---

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

better (as [Rios] was not in custody)." *Id.* "[T]hree minutes later," Fidel called Rios. Sentencing Hr'g Tr. at 38, *United States v. Rios*, No. 4:18-cr-00203-SMR-HCA (S.D. Iowa. 2020), ECF No. 177. "Using coded language, Fidel directed [Rios] to call down to Mexico and to get in contact with 'Bobby.'" PSR at 4.

The next day, Rios called the undercover officer several times and discussed drug quantity and prices. The officer asked Rios how much they were talking about and suggested 40 pounds. "[Rios] replied that they could do either '40' or '60' [pounds]." *Id.* at 5 (second alteration in original). The officer then indicated that he had the "$235,000" for 40 pounds of methamphetamine. *Id.* The officer and Rios later discussed where the deal would happen. The officer suggested Iowa; Rios stated the deal would occur in Los Angeles.

Over the next few weeks, details of the deal were worked out. According to the plan, "Bobby" would travel to California. Upon arrival, "Bobby" would pick up money that he had shipped in the mail and notify Rios that he was ready to proceed. The deal was planned for around August 10, 2018. Prior to that date, Rios and Fidel were in frequent contact and used coded language—including baseball references—to discuss the impending deal. Fidel told Rios, for example, "that the 'boys bought the tickets for the first game,'" meaning that "Bobby" would be coming to California. *Id.* In another call, Fidel directed Rios to tell "Bobby" that if things went well, they could "go to away games too," meaning deliver to Iowa in the future. *Id.*

On August 9, 2018, Rios told the undercover officer that they were "a go" for the next day and things were "all set." *Id.* The next day, Rios texted the officer that things were "running smooth" and that a male would be contacting him soon. *Id.* A short time later, the officer received a phone call from a man, and the officer told him the money had arrived and he would be on his way soon. The man later arrived at a pre-arranged meet location with approximately 20 pounds of methamphetamine. Officers then announced their presence.

Rios was charged with conspiracy to distribute at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Rios pleaded guilty pursuant to a written plea agreement. After pleading guilty, Rios gave a proffer interview to Des Moines Police Officer Benjamin Carter. During that interview, Rios claimed this transaction was her first involvement in drug trafficking. She maintained that she did not know any of the parties involved in the transaction other than her brother but "that the people involved trusted her nonetheless." Sentencing Hr'g Tr. at 28. Rios asserted that her involvement in the transaction was limited to passing phone numbers between unknown people at her brother's request. Rios denied knowing anyone in Mexico involved with drug trafficking and claimed that she did not know who Fidel contacted in Mexico regarding the deal.

Prior to sentencing, Rios argued she was eligible for safety-valve relief. The government disputed Rios's eligibility; it contended that Rios failed to provide complete and truthful information during her proffer interview. The government noted, for example, that Rios's use of highly coded drug language to oversee a 20-pound methamphetamine transaction was inconsistent with her claim of no prior involvement in drug trafficking. The government also noted that the evidence indicated Rios's familiarity with numerous people involved in the deal, including "Cupido."

At sentencing, the parties offered evidence on the issue of safety-valve eligibility. Rios testified that she was completely truthful during her proffer interview. However, Officer Benjamin Carter, the case agent, testified to numerous examples of inconsistent, incomplete, and untruthful information Rios provided during the interview. Officer Carter testified that, during the conversations he had with Rios in his undercover capacity, it appeared that "[s]he was making the calls as far as the decisions in the transaction." Sentencing Hr'g Tr. at 24. Officer Carter noted that the CS had identified "Pancha"—Rios's nickname—as "the individual running the show out in Washington and making the connections." *Id.* at 28. Officer Carter also

testified about Fidel's phone call to "Cupido," in which Fidel advised "Cupido" to "call Pancha" when they were arranging the drug deal. *Id.* at 31. The government also offered transcripts of numerous recorded phone calls between Fidel and Rios. Officer Carter testified that those calls involved "the most highly sophisticated coded language [he] ha[d] seen to date." *Id.* at 32.

After hearing the evidence, the district court denied Rios safety-valve relief. The court found Officer Carter's testimony credible and Rios's testimony not credible. First, the court pointed to the "highly coded, very sophisticated, almost casual conversations between [Fidel and Rios] about significant drug-trafficking activities." *Id.* at 45. The court found it implausible that Rios had never previously engaged in a drug-trafficking transaction based on her language. Second, the court found "a clear mutual understanding of terms" and "people." *Id.* The court found it "inconceivable" that Rios's involvement was limited to passing numbers between unknown people given her understanding of the transaction and her familiarity with the parties, including "Cupido." *Id.* at 45–46. The court found by a preponderance of the evidence that Rios failed to establish her eligibility for a safety-valve reduction.

The court adopted the Guidelines calculations contained in the PSR. Rios's advisory Guidelines range was 210 to 262 months' imprisonment. The district court, citing a policy disagreement with the drug guidelines, varied downward and sentenced Rios to 157 months' imprisonment.

## II. *Discussion*

On appeal, Rios argues that the district court erred by denying her safety-valve relief and imposing an unreasonable sentence of 157 months' imprisonment.

### A. *Safety-Valve Relief*

Rios contends that the district court erroneously denied her safety-valve relief. *See* 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2(a). "These provisions allow a district court

to impose a sentence below the statutory minimum sentence if the defendant satisfies each of five requirements." *United States v. Delgrosso*, 852 F.3d 821, 829 (8th Cir. 2017). "The only requirement at issue in this case is the final one, that the defendant 'truthfully provide[] to the Government all information and evidence the defendant has concerning the offense . . . .'" *United States v. Cervantes*, 929 F.3d 535, 538 (8th Cir. 2019) (alterations in original) (quoting 18 U.S.C. § 3553(f)(5)). The defendant bears the burden of proving that she has satisfied this requirement. *Id.* "We review for clear error a district court's findings as to the completeness and truthfulness of a defendant's safety-valve proffer." *United States v. Bolanos*, 409 F.3d 1045, 1047 (8th Cir. 2005).

"A defendant must prove through affirmative conduct, that he or she gave the Government truthful information and evidence about the relevant crimes before sentencing." *United States v. Soto*, 448 F.3d 993, 996 (8th Cir. 2006) (cleaned up). "In making its assessment of the truthfulness of a safety valve proffer, the district court is entitled to draw reasonable inferences from the evidence." *United States v. Alvarado-Rivera*, 412 F.3d 942, 948 (8th Cir. 2005) (en banc). A district court's finding that a defendant's "proffered testimony was not sufficiently credible to meet [the defendant's] burden for receiving safety-valve relief" is a "credibility finding" that "[w]e generally do not disturb." *Soto*, 448 F.3d at 996.

While Rios argues that "no concrete evidence" exists "that she had ever been involved in drug trafficking," Appellant's Br. at 9, the district court drew "reasonable inferences from the evidence," *Alvarado-Rivera*, 412 F.3d at 948, to support its finding that Rios was not credible. First, Rios claimed in her proffer interview that the drug transaction was her first foray into drug trafficking. But the district court cited transcripts of the recorded calls between Fidel and Rios. It characterized these calls as involving "highly coded, very sophisticated, almost casual conversations between two people about significant drug-trafficking activities" involving "hundreds

of thousands of dollars." Sentencing Hr'g Tr. at 45. From these calls, the district court could reasonably infer Rios's prior involvement in drug trafficking.

Second, Rios claimed during her proffer interview that she did not know any of the parties involved in the transaction other than her brother, but "that the people involved trusted her nonetheless." *Id.* at 28. The evidence, however, undermines Rios's claim that she did not know the parties involved. As the district court noted, the calls between Fidel and Rios reflect her "clear mutual understanding" of people involved, including "Cupido." *Id.* at 45. For example, during the call between Fidel and "Cupido," "Cupido" instructed Fidel to have Rios—who he referred to by her nickname "Pancha"—call him so that "they could talk better (as [Rios] was not in custody)." PSR at 4. "[T]hree minutes later," Fidel called Rios. Sentencing Hr'g Tr. at 38. "Using coded language, Fidel directed [Rios] to call down to Mexico and to get in contact with 'Bobby.'" PSR at 4.

Third, Rios claimed in her proffer interview that her involvement in the transaction was limited to passing phone numbers between unknown people. The district court found her claim "inconceivable" given her familiarity with the parties. Sentencing Hr'g Tr. at 46. Again, the evidence shows that "Cupido" directed Fidel to have "Pancha" call him about the drug deal, followed by Fidel's immediate call to Rios to report his conversation with "Cupido."

Accordingly, we hold that the record amply supports the district court's finding that Rios failed to provide complete and truthful information. Therefore, we affirm the district court's denial of safety-valve relief to Rios.

B. *Substantive Reasonableness*

Rios next argues that her 157-month sentence is substantively unreasonable. First, she asserts that the nature and circumstances of the offense favored a downward variance because her "involvement in this conspiracy was one where she never

touched a gram of methamphetamine or a dollar of cash." Appellant's Br. at 12. Second, she notes that she "turn[ed] herself in at the U.S.-Mexico border" despite knowing she would be apprehended by authorities. *Id.* Third, she asserts that she engaged in criminal activity not for profit but instead to help her brother.

We review the substantive reasonableness of a sentence "under a deferential abuse-of-discretion standard." *United States v. Fry*, 792 F.3d 884, 892 (8th Cir. 2015). Under this deferential standard, "the [district] court has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009). "A district court abuses its discretion and imposes an unreasonable sentence when it fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor, or considers the appropriate factors but commits a clear error of judgment in weighing those factors." *United States v. Williams*, 934 F.3d 804, 808 (8th Cir. 2019) (quotation omitted).

We conclude that Rios's 157-month sentence—a 53-month downward variance from the Guidelines range—is substantively reasonable. The district court's sentence reflects full compliance with the applicable sentencing statutes and Guidelines provisions, taking into account the specific characteristics of this defendant, the circumstances, and nature of the offense. As a result, we hold that the district court did not abuse its discretion in sentencing Rios to 157 months' imprisonment.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____